Chief Justice FLAHERTY joins this concurring opinion.

**GMH ASSOCIATES, INC., Appellee,**

v.

**The PRUDENTIAL REALTY GROUP, CB Commercial Real Estate Group and Douglas Joseph, Appellants.**

Superior Court of Pennsylvania.

Argued June 15, 1999.

Filed March 1, 2000.

Reargument Denied April 26, 2000.

David A. Brownlee, Pittsburgh, for appellants.

William H. Lamb, West Chester, for appellee.

Before McEWEN, President Judge, and CAVANAUGH and EAKIN, JJ.

CAVANAUGH, J.:

■ ¶ 1 This is an appeal from the judgment entered on a non-jury verdict in a case involving failed negotiations between the parties to a proposed sale of commercial real estate. Appellee, the prospective buyer, sued appellants, the sellers of the real property in question, for breach of contract and fraud after the property was ultimately conveyed to another purchaser. The trial court concluded, *inter alia*, (1) that an oral contract for the sale of the real property was formed between the sellers and the prospective buyer; (2) that in procuring the oral contract, the sellers defrauded the prospective buyer; (3) that the sellers breached the oral contract when they sold the property to the actual buyer; and (4) that the sellers were liable to the prospective buyer for compensatory and punitive damages in an aggregate amount of approximately $30.34 million. After careful review, we conclude that the trial court erred in awarding judgment in favor of the prospective buyer. Thus, we conclude that the sellers are entitled to judgment notwithstanding the verdict and, accordingly, we reverse.[1]

¶ 2 The record shows that on May 13, 1996, appellant, Prudential Realty Group (hereinafter "Prudential" and/or "Seller"), entered into a Letter of Interest (LOI) with appellee, GMH Associates (hereinafter "GMH" or "Buyer"), for the sale of commercial real estate in Montgomery County known as Bala Plaza (the Property).[2] The LOI contained certain terms and conditions previously discussed between the parties regarding the contemplated sale of the Property, including the following: the Property would be sold "AS IS" for a purchase price of $109.25 million; Buyer had begun "due diligence" and would complete same by 5 p.m. on July 3, 1996; the parties would endeavor to execute a formal, written contract of sale by that date; and the transaction would close

---

1. Appellants' brief to this court alleges only that they are entitled to "judgment on" appellee's claims. Clearly, however, appellants seek judgment notwithstanding the verdict (JNOV). JNOV is an extraordinary remedy appropriately entered only when, viewing the evidence and all reasonable inferences in favor of the verdict winner, no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *See Rohm and Haas Co. v. Continental Cas. Co.*, 732 A.2d 1236, 1254 (Pa.Super.1999). We note, with some dismay, that appellants have failed to state the precise relief sought and have included no discussion of JNOV in the scope and standard of review section contained in their brief to this court as is made mandatory by our Rules of Appellate Procedure. *See* Pa.R.A.P. 2111(a)(2) and (8). (Previously 3518). Indeed, nowhere in appellants' extensive brief is mention made of this important aspect of their appeal. Nonetheless, as will be more fully developed in our disposition of the case, we conclude that appellants have met the difficult standard imposed and are entitled to JNOV on each of appellee's claims.

2. Prudential held title to the Property. Prudential's agent charged with handling the details of the transaction was Devon Glenn. Appellant, CB Commercial Real Estate Group was the entity Prudential used to market the Property. Appellant Douglas Joseph is CB Commercial's agent. Gary Holloway is the CEO and sole shareholder of appellee Buyer, GMH. Bruce Robinson is GMH's Chief Financial Officer.

on July 19, 1996.[3] The LOI contained the following clause in large, bold print:

NOTWITHSTANDING THAT EITHER OR BOTH PARTIES MAY EXPEND SUBSTANTIAL EFFORTS AND SUMS IN ANTICIPATION OF ENTERING A CONTRACT, THE PARTIES ACKNOWLEDGE THAT IN NO EVENT WILL THIS LETTER BE CONSTRUED AS AN ENFORCEABLE CONTRACT TO SELL OR PURCHASE THE PROPERTY AND EACH PARTY ACCEPTS THE RISK THAT NO SUCH CONTRACT WILL BE EXECUTED.

¶ 3 Immediately below the bold print the LOI stated that "each party shall be free to terminate negotiations with the other for any reason whatsoever, at any time prior to the execution of the Contract without incurring liability to the other[.]" The LOI further stated:

Any Contract which may be negotiated shall not be binding on Seller until it has been approved by the senior corporate officers and the Law Department of Seller and by the Finance Committee of Seller's Board of Directors. Such approvals are conditions precedent to the Seller's obligation to perform under the terms of the Contract, and may be withheld for any reason or for no reason.

¶ 4 At trial, it was established that Seller told Buyer that in exchange for Buyer's execution of the LOI, Seller would take the property "off the market." The record is also clear that both parties were aware, prior to executing the LOI, that Buyer was negotiating a master lease/purchase option agreement with a prospective tenant, the Allegheny Health and Education Research Foundation (hereinafter "Allegheny" or "AHERF"). Under this prospective agreement, on the same day Seller would convey the Property to Buyer, Allegheny would purchase the ground beneath a portion of Bala Plaza from Buyer for $6.2 million and would enter into a long-term lease with Buyer for office space in one of the Bala Plaza buildings.[4]

¶ 5 In late May or early June of 1996, Allegheny informed Buyer that it would be unable to negotiate the lease/purchase transaction for 90 days because Allegheny had failed to disclose the existence of this potential transaction in a recent bond issue. Buyer informed Seller of this "glitch" and assured Seller that it would nonetheless be able to meet the July 19th closing date. At the same time, Buyer notified Seller that its due diligence had uncovered some $3 million in capital improvements the Property required. Thus, Buyer sought to obtain a $3 million credit toward, or reduction below, the stated LOI purchase price.

¶ 6 On July 1st, Seller verbally agreed to Buyer's request to extend the closing date to July 31st. At the same time, Buyer suggested an "earn-out" proposal to Seller. Under the terms of this proposal, Buyer would forward to Seller, sometime after closing, a portion of the proceeds Buyer expected to receive as the result of executing the lease/purchase option with Allegheny.[5] In early July, Buyer's verbal offer for the property was $103 million in cash at closing plus a post-closing "earn out"

3. The record shows that in the weeks preceding the execution of the LOI, Buyer had inspected the Property and had begun conducting its "due diligence," i.e., its review of matters relating to, *inter alia*, title, land use, applicable zoning laws, profitability of existing and prospective leases and physical condition of the Property.

4. The court found that Seller knew that Buyer "was in a 'Catch–22' situation[,]" i.e., Buyer did not have resources to pay the full purchase price contained in the LOI unless Buyer

entered into and received proceeds from the prospective lease/purchase agreement with Allegheny, but Allegheny would not enter into the lease/purchase agreement unless Buyer could assure Allegheny that the Property was off the market.

5. We might take judicial notice that Allegheny filed for voluntary bankruptcy on July 21, 1998, in the Western District of Pennsylvania. However, since this is not of record in this case, we do not consider this fact in our disposition.

payment of $3.25 million after Buyer concluded its lease/purchase agreement with Allegheny. The remaining $3 million of the LOI purchase price would be deemed a capital improvements credit. Thus, the unconditional LOI purchase price of $109.25 million would not actually be met. Seller's net receipt of cash would be less than the LOI purchase price by an amount equal to the proposed capital improvements credit despite the provision of the LOI that the property was to be sold "AS IS."

¶ 7 In mid-July, Buyer increased its cash at closing offer to $103.5 million and lowered its capital credit request to $2.5 million. On July 30th, Seller's agent, Devon Glenn, asked Buyer to put the "earn-out" proposal in writing. Upon receiving same, Seller requested Buyer to give "teeth" to the proposal. The trial court found that by "teeth," Seller meant it wanted to be able to realize a percentage of any profit Buyer might get from consummating the Allegheny lease/purchase transaction. Buyer declined to put "teeth" into the "earn-out" proposal and on August 12, 1996, Glenn took the Buyer's purchase offer of $103.5 million cash at closing with a subsequent potential "earn-out" payment of $3.25 million to Prudential's investment committee for approval. The committee rejected Buyer's purchase offer that same date.[6]

¶ 8 From the time the parties executed the LOI, Seller repeatedly assured Buyer that the property was off the market and that Buyer was the only prospective purchaser. The court found that Seller did, in fact, keep the Property "off the market at least from May 13, 1996 until August 12, 1996." After August 12th, Seller continued to negotiate with Buyer and continued to assure Buyer that it was not "shopping the deal" to other prospective purchasers, when, in fact, Seller allowed the Government of Singapore Investment Corporation (GSIC) to tour the Property on August 21st to determine whether GSIC had any interest in purchasing the Property. For a period of approximately three weeks thereafter, Seller conducted negotiations with both prospective purchasers, GMH and GSIC, without telling either entity about its negotiations with the other.

¶ 9 When Seller rejected GMH's latest proposal on August 12th, Seller told GMH that it was not interested in an "earn out" proposal and would require an all cash offer. Thus, on August 16th, GMH made a new oral offer of $105.5 million, all cash at closing. Seller did not immediately act thereon because GSIC was also expected to make an offer. On August 27th, an internal memorandum of Seller stated that "we will have GSIC's offer by the end of the week ... we should be prepared to consider both proposals from GMH and GSIC and respond accordingly by Friday."

¶ 10 On August 30th, GSIC forwarded a letter of intent to Seller offering to purchase the Property for $108.5 million, all cash at closing. That date, Seller rejected GMH's $105.5 million all cash offer, but untruthfully continued to assure GMH that there existed no other bidder. Mr. Holloway, GMH's sole shareholder, was "bewildered" by Seller's rejection of GMH's offer

---

**6.** Buyer's equity partner in the proposed transaction was Goldman–Sachs. Goldman–Sachs was to contribute most of the purchase price and was to hold 90%–95% equity in the Property upon conveyance to Buyer. In mid-July, a conference call was held in which a Goldman–Sachs representative, Michael Fascitelli, told Seller's agent, Devon Glenn, that Goldman–Sachs would not contribute more than $103 million to the purchase price and that "if you have a better offer, a better deal, or you have somebody you think can close, you know, by all means, proceed, because we don't want to stand in [the] way." Gary Holloway, Buyer's sole share-holder, was a participant in the call. After Mr. Fascitelli exited the call, Mr. Holloway told Glenn that Mr. Facscitelli "was not driving the deal" and that any additional funds necessary beyond Goldman–Sach's contribution to the purchase price would come directly from Buyer and/or Allegheny. Thus, it appears that Buyer's contribution to the rejected August 12th purchase offer of $103.5 million with a later prospective $3.25 million "earn-out", was $500,000.

and asked Seller for a counteroffer. Mr. Holloway was told that Seller did not make counteroffers. Mr. Holloway then asked for a number which would represent the final price at which Seller would agree to convey the Property. He was told by Mr. Glenn that a number might be forthcoming the following Tuesday, September 3 rd. At that point, Mr. Holloway became irate, and angrily responded that he felt Seller was "re-trading" the deal and that he was so disgusted with the negotiations that he was not sure whether he wanted a number.

¶ 11 During the week of September 3 rd, Mr. Holloway contacted Mr. Joseph, CB Commercial's agent, to say he did, in fact, want a number at which the sale would finalize, and asked whether that number might be $106.75 million.[7] He was told that the number had moved "north" of $107 million because there was "activity in the marketplace" supporting a higher price. Joseph, however, denied that there was a competing bidder. On September 9 th, GMH's Chief Financial Officer, Bruce Robinson, spoke with Devon Glenn who told Robinson that "if he wanted to make sure that GMH got the property, he must offer ... $107,250,000 because that was the number Devon Glenn knew he could get the deal approved at[.]" Trial Court Finding of Fact No. 84.

¶ 12 However, the next day, September 10 th, Joseph told Robinson that

[t]here were three people interested in the property and he was concerned they were going to put in bids on the property; that he [Robinson] asked Doug Joseph how could anyone else be bidding on the property when GMH was told there was nobody else negotiating, and Mr. Joseph did not respond; that [Robinson] asked if one of the parties was Cali Realty, and Mr. Joseph responded that Cali was not the one that concerned

him; that when [Robinson] asked who concerned him, Mr. Joseph responded that he had taken a large international buyer through the property at the end of August and he believed they were going to bid for the property; [and] that Mr. Joseph then told him it was really important that GMH put its best offer on the table if it wanted to get the property[.]

Trial Court Finding of Fact No. 88. Joseph, at that time, advised Robinson that GMH's next offer had to be in writing and did not disclose to GMH that GSIC had already submitted a written $108.5 million bid on the Property. Immediately after speaking with Joseph, Robinson called the leasing agent for the Property, Janet Giuliani. Giuliani informed Robinson that the large international buyer was GSIC and confirmed that GSIC had toured the Property. Trial Court Finding of Fact No. 89.

¶ 13 The next day, September 11 th, Mr. Holloway and Mr. Robinson decided that they would meet Seller's "offer" of $107.25 million. Also that date, before putting their "acceptance" of Seller's "offer" in writing, the pair met with representatives of Allegheny. The meeting had been called by Allegheny. Holloway believed that Allegheny was nearing the end of its 90 day moratorium on lease negotiations and that Allegheny may have called the meeting to inform GMH thereof. At the beginning of the meeting, Holloway told the Allegheny representatives that "GMH had a deal with Prudential, that GMH and Prudential had agreed to a price, and GMH was moving toward closing[.]" Trial Court Finding of Fact No. 92. At the conclusion of the meeting, Allegheny told GMH that they had an agreement in principle to the lease/purchase transaction but that further negotiations were necessary

7. On August 12 th, when Seller rejected Buyer's earn-out proposal, the parties discussed an all cash offer. At that time, Mr. Glenn told Mr. Holloway that "$106,750,000 was an all cash offer that he felt 95% sure he could get approved [by Prudential's finance commit- tee]." Buyer's rejected "earn out" offer would also have potentially amounted to $106.75 million, i.e., $103.5 million cash at closing with a later $3.25 million "earn out" payment.

to resolve some outstanding issues, namely "clarification from GMH on when GMH would be able to put tenants into the Bala buildings and whether GMH was able to give Allegheny an additional $10 [per square foot] allowance [on a 185,000 square foot space] for tenant improvement." [8] Trial Court Finding of Fact No. 93. The court found these issues did not appear to be material or significant to the ultimate completion of the GMH/Allegheny transaction. Trial Court Findings of Fact Nos. 93, 94.

¶ 14 Later in the day, Mr. Robinson called Mr. Joseph to inform him that GMH had "accepted" Prudential's "offer" of $107.25 million and would put the acceptance in writing. Joseph suggested that the writing be in a letter of interest format. Thus, on September 11th, Robinson forwarded a letter to Devon Glenn which stated, in pertinent part:

> This letter summarizes certain revised terms and conditions which we have discussed regarding the sale of [the Property] by Prudential Insurance Company of America ("Seller") to GMH Associates, Inc. ("Purchaser").
>
> 1. *Purchase Price.* The Purchase Price for the Property will be $107,250,000.00 ("Purchase Price") payable as follows:
>
> (a) $1,000,000.00 in immediately available funds . . . upon full execution of the contract for the sale and purchase of the property . . . .
>
> (b) The balance of the Purchase Price would be paid upon closing . . . .
>
> 2. *Due Diligence and Inspection Contingencies*

> (a) Both Purchaser and Seller acknowledge that there is an outstanding environmental issue . . . . Purchaser and Seller both agree to have their respective representatives meet in order to come to a mutually agreeable resolution to this issue.
>
> . . . .
>
> All other terms and conditions of the letter of interest dated May 13, 1996 between Purchaser and Seller shall remain in full force and effect except for the items mentioned above, and the contract and closing dates of which shall now be changed to October 31, 1996.
>
> If you are in agreement with the above please so indicate by signing the enclosed copy of this letter in the space provided below and return to us as soon as possible.
>
> Sincerely Yours,
>
> GMH ASSOCIATES, INC.
>
> By: [*Signature*]
> Bruce F. Robinson
>
> AGREED TO AND ACCEPTED:
>
> By: _____
> Name:
> Title:
> Date Executed:

¶ 15 On September 12th, Devon Glenn called Joseph Grubb, GSIC's agent. Glenn informed Grubb that Prudential had received an offer from GMH that was a "higher net number than GSIC's offer." [9] Mr. Glenn further told Grubb that if GSIC agreed to pay $806,158 toward tenant improvements and brokerage commissions (TIBCs) then Prudential would sign GSIC's letter of intent. GSIC agreed to the proposal which, as the trial court

---

8. Thus, it appears that Allegheny wanted to negotiate a $1.85 million credit from GMH toward tenant improvements.

9. As the trial court explained:
 The reason GMH's $107.25 million number was a higher net number than GSIC's $108.5 million number was because, in its LOI, GMH agreed to pay tenant improvements and broker's commissions, which were $1.6 million. GSIC had no such provision in its offer. Therefore, comparing "apples to apples", GMH's number was $107.25 [million] plus $1.6 million, or $108,850,000, and GSIC's was $350,000 less.
 Trial Court Opinion at 47. (References to notes of testimony omitted).

found, made GSIC's "offer approximately $500,000 more than GMH's number, including TIBCs." Trial Court Finding of Fact No. 114.

¶ 16 That same date, Glenn and Joseph informed Holloway and Robinson that Prudential had rejected GMH's bid and had agreed to sell the Property to GSIC.

¶ 17 GMH subsequently sued Prudential, CB Commercial Real Estate and Douglas Joseph. The complaint alleged Breach of Contract, Breach of Duty to Negotiate in Good Faith, and Promissory Estoppel against Prudential. It further alleged Fraudulent Misrepresentation, Fraudulent Nondisclosure, and Civil Conspiracy against all defendants. The complaint's claim against CB Commercial and Douglas Joseph for Corrupt Real Estate Licensees' Practices was later withdrawn.

¶ 18 Following a non-jury trial, the court found for GMH on all its claims and awarded damages to GMH for lost profits in the amount of $20,340,623. It also awarded GMH $10,000,000 in punitive damages—$7,000,000 assessed against Prudential and $3,000,000 assessed against CB Commercial. No punitive damages were assessed against Douglas Joseph.

¶ 19 The trial court authored a lengthy opinion in support of its determination. Among other things, the court concluded that GMH and Prudential entered into an enforceable oral contract for the sale of the Property on September 11th; that Prudential defrauded GMH and failed to negotiate in good faith in procuring the oral contract; that GMH relied to its detriment on Prudential's representations; that Prudential breached the September 11th oral contract with GMH when it subsequently sold the property to GSIC; and that GMH was entitled to damages in the nature of lost profits.

¶ 20 Prudential now appeals, contending that the court's verdict is not sustainable under any of the causes of action GMH presented. We agree.

## A. Breach of Contract

 ¶ 21 Contrary to the trial court's determination, we find that no oral contract for the sale of the Property arose. "In the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact." *Yaros v. Trustees of the University of Pennsylvania*, 1999 PA Super 303, ¶ 8, 742 A.2d 1118 (citing *United Coal v. Hawley Fuel Coal, Inc.*, 363 Pa.Super. 106, 525 A.2d 741, 742 (1987)). This court is bound by the trial court's findings of fact, unless those findings are not based on competent evidence. *Thatcher's Drug Store v. Consolidated Supermarkets, Inc.*, 535 Pa. 469, 477, 636 A.2d 156, 160 (1994). Absent an abuse of discretion, we are bound by the trial court's assessment of the credibility of the parties and witnesses. *Id.* However, the trial court's conclusions of law are not binding on an appellate court whose duty it is to determine whether there was a proper application of law to the facts by the trial court. *Id.*

¶ 22 It appears the court's conclusion that an enforceable oral contract was formed between the parties was based, in part, on its finding that $107.25 million was Prudential's "will sell" price. The court found Mr. Robinson credible and credited his testimony that on September 9th, Devon Glenn asserted he could "close the deal" at a purchase price of $107.25 million; that the price quoted was "not a moving target" and represented the "number that we will sell the property to you for." Trial Court Findings of Fact Nos. 83, 84, 180. Further the court found that GMH "met" Prudential's "will sell" offer on the basis of the content of the September 11th letter of interest, which stated that the purchase price would be $107.25 million. Trial Court Finding of Fact No. 95. Thus, the court implicitly found that on September 9th, Prudential orally "offered" to sell the Property to GMH for $107.25 million and that on September 11th, GMH "accepted" Prudential's offer,

in writing, by forwarding the letter of interest containing the agreed upon purchase price. Based on these findings, the court concluded that an enforceable oral contract for the sale of the Property arose on September 11 th.

¶ 23 We find that the court's determination was legal error.[10] First, we cannot agree that Glenn's statements to Robinson on September 9 th constituted an offer to sell. "The first essential of any contract is the existence of a promise or an offer to enter into a contract. Such promise must be definite and certain ...." *Fahringer v. Strine Estate*, 420 Pa. 48, 59, 216 A.2d 82, 88 (1966). Robinson testified that during his conversation with Glenn on September 9 th, Glenn said "I'm not saying you can't *offer* a lower number and that we won't *accept* a lower number. However, if you want to make sure you get the property, you must *offer* the $107,250,000 because that's the number I know *I can get the deal approved at.*" We find that Prudential, through Glenn, was soliciting an offer from GMH which would then be taken to Prudential's decision makers for approval and acceptance. Moreover, it appears that GMH was aware, on September 9 th, that Prudential was seeking an offer because Robinson testified that shortly after speaking with Glenn, he discussed with Holloway what GMH's "bid" should be in response to Glenn's statements.

¶ 24 Assuming *arguendo* that Glenn's statements on September 9 th did, in fact, constitute an offer to sell the property for a sum certain, we would find the offer was revoked the next day when Joseph informed Robinson that there were other likely bidders competing for the Property; that GMH's next offer had to be in writing; and that GMH's next offer

ought to be its best offer.[11] Trial Court Findings of Fact Nos. 86, 88. It is hornbook law that an offeree's power to accept an offer is terminated by a revocation of the offer by the offeror. *First Home Savings Bank, FSB v. Nernberg*, 436 Pa.Super. 377, 648 A.2d 9, 15 (1994); Restatement (Second) of Contracts § 36 (1981).

¶ 25 Moreover, GMH's purported acceptance of Prudential's offer, made via the unexecuted letter of interest dated September 11 th, included a clause stating that the parties would agree to discuss an open and apparently unresolved environmental issue regarding the property. "[A] reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counter-offer, having the effect of terminating the original offer." *Id.* (citing *Accu–Weather, Inc. v. Thomas Broadcasting Co.*, 425 Pa.Super. 335, 625 A.2d 75, 77 (1993)). Thus, even if Glenn's statements on September 9 th constituted an offer, and even if Joseph's statements on September 10 th did not work a revocation of that offer, we would find that GMH's purported acceptance constituted a counter-offer and thus, no enforceable contract was formed. We find that the court erred to the extent it concluded that GMH's "acceptance" did not vary the terms of the "offer." The characterization of the environmental issue, as one that might be resolved by "representatives" does not, *ipso facto*, render an unresolved issue resolved. We additionally note that, on its face, the unexecuted letter of interest, which the court concluded was GMH's "acceptance," does not purport to be an acceptance at all, but, in fact, is drafted as an offer. We conclude that GMH's offer to buy the Proper-

10. We note that "error" is the label an appellate court is obliged to apply in situations where the appellate tribunal disagrees with the trial court as to what the law requires under the specific factual circumstances of a case and that our application of the label "error" reflects our considered disagreement with the trial court's decision but is not intended to fault the trial judge's performance. *See Hanna v. Key Computer Systems, Inc.*, 386 Pa.Super. 8, 562 A.2d 327, 329 n. 1 (1989).

11. As previously explained, Joseph did not reveal that GSIC had actually submitted a bid.

ty was rejected by Prudential and that no contract was formed.

¶ 26 Further, it is clear that the parties always intended and agreed that any binding transaction between them for the conveyance of the Property would be accomplished by a written contract. This intention is stated and agreed to by the parties in the executed LOI of May 13 th and is adopted by reference in GMH's unexecuted September 11 th letter of interest.

¶ 27 Our supreme court has recently reiterated that "[w]here the parties have agreed orally to all the terms of their contract, and a part of the mutual understanding is that a written contract embodying these terms shall be drawn and executed by the respective parties, such oral contract may be enforced, though one of the parties thereafter refuses to execute the written contract." *Shovel Transfer & Storage, Inc. v. PLCB*, 559 Pa. 56, 66, 739 A.2d 133, 138 (1999) (quoting *Ketchum v. Conneaut Lake Co.*, 309 Pa. 224, 163 A. 534, 535 (1932)). *See also Mazzella v. Koken*, 559 Pa. 216, 224, 739 A.2d 531, 536 (1999) ("[w]here the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such an agreement"). Relying on decisional precedent which embodies this proposition, the trial court concluded that an enforceable contract arose on September 11 th despite the fact that no written contract was ever executed. Trial Court's Conclusions of Law 1–12. The court concluded that GMH's September 11 th letter of interest was a binding acceptance of Prudential's purported September 9 th offer, presumably because all the essential terms necessary to form a valid contract for the sale of real estate were set forth therein and had been orally agreed to by the parties. We find that the court's conclusion in this regard was error.

¶ 28 The essential terms that must be identified and agreed to in order to form a valid contract for the sale of real estate are the naming of the specific parties, property and consideration or purchase price. *See Detwiler v. Capone*, 357 Pa. 495, 502, 55 A.2d 380, 385 (1947). Where the existence of an informal contract is alleged, "it is essential to the enforcement of such an informal contract that the minds of the parties should meet on all the terms as well as the subject matter. If anything is left open for future [negotiation], the informal paper cannot form the basis of a binding contract." *Isenbergh v. Fleisher*, 188 Pa.Super. 99, 145 A.2d 903, 907 (1958). We conclude that there was no mutual assent between the parties as to essential terms or the subject matter of the transaction and that all issues surrounding the structure of the proposed transaction had not been closed.

¶ 29 First, the original LOI contemplated a $109.25 million all cash at closing purchase price. At the same time that GMH informed Prudential that there was a "glitch" in procuring Allegheny's involvement, it also informed Prudential that its due diligence had uncovered $3 million in necessary capital improvements. Despite the LOI's "AS IS" language, GMH sought a $3 million capital improvements credit. Although it appears that the parties may have agreed that a capital improvements credit would be appropriate, the evidence is that when GMH's "earn out" proposal was rejected and the parties began to focus on an all cash price, the parties were still $1.5 million apart on the amount of any capital improvements credit. Trial Court Finding of Fact No. 48. The evidence does not suggest that gap was ever closed. Thus, we conclude that an essential term, namely, the purchase price amount, as affected by the capital improvements credit, had never been agreed to by the parties and thus that no enforceable contract arose.

¶ 30 Second, the September 11 th "acceptance" letter of interest specifically

incorporated the terms of the original LOI of May 13 th. The May 13 th LOI provided that "the parties have not attempted in this letter to set forth all essential terms of the subject matter of this transaction, and such essential terms shall be the subject of further negotiations." Moreover, the September 11 th letter expressly provided that the parties would continue to negotiate regarding an unresolved environmental issue. Because recognized issues remained unresolved, no mutual assent existed sufficient to bind the parties.

¶ 31 Third, the executed LOI of May 13 th contained an express condition precedent that was never met. The parties agreed that any written contract they might negotiate would not bind Seller unless it was approved by Seller's senior corporate officers, law department and board finance committee. It is undisputed that no corporate approval was given to the terms of the Buyer's September 11 th proposal and thus, we conclude that no enforceable contract arose.

¶ 32 In sum, we find that the court erred in its conclusion that an enforceable oral contract for the sale of the Property arose on September 11 th. We find that no contract of sale existed between the parties. Accordingly, we conclude there was no breach of contract when Prudential failed to sell the Property to GMH.

### B. Fraud

¶ 33 The trial court concluded that "Prudential obtained the oral agreement of September 11 th by fraud." Trial Court Conclusion of Law No. 82. Specifically, the court found as fact that all defendants, between August 15 th and September 12 th, continually assured GMH that Prudential was not negotiating with other prospective buyers, when in fact, Prudential was actively negotiating with GSIC during that period. The court concluded that these assurances were fraudulent misrepresentations. Similarly, the court concluded that after August 15 th, the defendants' failure to inform GMH that Prudential was nego-

tiating with GSIC amounted to fraudulent nondisclosure of the fact that the Property was no longer "off the market". Thus, the court concluded that the oral contract of sale created on September 11 th, was procured through fraud.

¶ 34 Initially, because we find that no contract was created, we correspondingly conclude that no fraud was committed in its alleged procurement. However, even if the elements of an oral contract had been created on September 11 th, we would nonetheless be constrained to conclude that defendants' collective failure to disclose, between August 15 th and September 12 th, that the Property was no longer "off the market," as well as their affirmative statements that GMH was the exclusive bidder, were immaterial to the transaction at hand, i.e., GMH's decision to offer $107.25 million and Prudential's decision to reject that offer. Thus, we would conclude that no fraud was committed.

¶ 35 The elements of intentional misrepresentation are as follows:

(1) A representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intention of misleading another party into relying on it;

(5) justifiable reliance on the misrepresentation; and;

(6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994), *citing*, Restatement (Second) of Torts § 525 (1977). The tort of intentional non-disclosure has the same elements as intentional misrepresentation "except in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Id.*

*Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999).

¶ 36 The trial court found that Prudential's failure to disclose that the Property was not off the market and its assertions that GMH was the exclusive prospective buyer were material misrepresentations upon which GMH relied to its detriment. Specifically, the court concluded that had GMH known there was another prospective buyer, GMH's negotiating stance would have been "different" and that "GMH would have insisted on Prudential's final position regarding price structure and would have closed the deal." The court presumably concluded that had GMH known that GSIC had previously offered $108.5 million for the Property and that, consequently, GMH's offer of $107.25 million on September 11th would be rejected by Prudential or used by Prudential as a bargaining chip in its negotiations with GSIC, GMH would have instead offered a higher, acceptable price that GSIC would be unable or unwilling to better. Indeed, the court found that had GMH known about GSIC's interest, even as early as August 12th, GMH would have immediately acceded to Prudential's pricing terms and that GMH could have done so because "Mr. Holloway's net [personal] worth exceeded $53 million in 1996, and he had the ability to raise additional money to close the deal."

¶ 37 "A misrepresentation is material if it is of such character that had it not been made, or in the present case, had it been made, the transaction would not have been consummated." *Sevin v. Kelshaw*, 417 Pa.Super. 1, 611 A.2d 1232, 1237 (1992). Mere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment. *Baker v. Cambridge Chase, Inc.*, 725 A.2d 757, 770 (Pa.Super.1999). We find that Prudential's assertions were not material to the transaction at hand and conclude that Prudential was under no legal duty to reveal the existence of its negotiations with GSIC to GMH.

¶ 38 First, as previously explained, on September 10th, Joseph informed Robinson that there were other prospective purchasers interested in the Property and that Joseph was concerned a large international buyer, which had been shown the property in late August, was going to bid on the Property. Joseph informed Robinson that "it was really important that GMH put its best offer on the table if it wanted to get the property." Trial Court Finding of Fact No. 88. Also on September 10th, Giuliani informed GMH that the international buyer was GSIC and confirmed that it had toured the Property. Finding of Fact Number 89.

¶ 39 Thus, prior to making its bid of $107.25 million, while GMH had not been specifically told that Prudential was actively negotiating with GSIC, GMH was nonetheless aware that GSIC had been shown the Property several weeks earlier and that Prudential was expecting it, and perhaps others, to bid on the Property. We conclude that by at least September 10th, GMH was on notice that it was no longer the only prospective bidder. Therefore, we conclude that Prudential's assertions, prior to that time, that GMH was the only prospective bidder were immaterial to the bid amount that GMH submitted in writing on September 11th.

¶ 40 Further, the purported "will sell" price was also rendered immaterial to the transaction by GMH's knowledge that there existed other prospective bidders who, presumably, could offer a purchase price equal to or greater than the "will sell" price. Indeed, it is undisputed that the purchase price originally sought by Prudential, as contained in the May 13th LOI, was $2 million higher than the "will sell" price of September 9th. Given GMH's interim acquisition of knowledge of the competitive nature of the sale, we believe the "will sell" price as represented on September 9th, was not material to the purported transaction which occurred on September 11th.

¶ 41 Second, we conclude that Prudential was not under a legal duty to inform GMH that it had, in late August, entered into serious negotiations with GSIC, given GMH's inability to close the deal prior to that time and in light of Prudential's August 12th rejection of GMH's "earn out" proposal. The court found that "the parties agreed the Bala Property would be kept 'off the market' as long as GMH was 'seriously pursuing the acquisition of the property *and [was] meeting the deadlines that they proposed to [Prudential].'*" (Emphasis supplied). The court found that the Property was, in fact, "off the market" for approximately three months between May 13th and August 12th. However, during those three months, GMH failed to satisfactorily show Prudential that it had the ability to meet the LOI purchase price or to secure Allegheny's simultaneous lease/purchase agreement necessary to complete the successful conveyance of the Property. Notwithstanding the fact that Prudential and GMH continued to negotiate past August 12th, we find that Prudential was under no legal duty to disclose the fact that the Property was no longer "off the market," given GMH's apparent inability to close the transaction with Prudential prior to that time and in light of the parties' agreement as to when and how long the property would, in fact, remain "off the market."

¶ 42 In short, we conclude that no fraud arose between these two sophisticated business entities during the course of their failed negotiations for the sale of the Property.

### C. Duty to Negotiate in Good Faith

¶ 43 The court determined that Prudential breached a duty to negotiate in good faith by failing to keep the Property off the market.

¶ 44 Our courts have not determined whether a cause of action for breach of duty to negotiate in good faith exists in Pennsylvania. *Jenkins v. County of Schuylkill*, 441 Pa.Super. 642, 658 A.2d 380, 385 (1995). The Third Circuit Court of Appeals has predicted that Pennsylvania would recognize such an action. *See Flight Systems, Inc. v. EDS Corp.*, 112 F.3d 124, 129 (3d Cir.1997) (citing *Channel Home Centers v. Grossman*, 795 F.2d 291, 299 (3d Cir.1986)).

¶ 45 This court has previously quoted the following principle with approval: "The full extent of a party's duty to negotiate in good faith can only be determined, however, from the terms of the letter of intent itself." *Jenkins*, 658 A.2d at 385 (quoting *A/S Apothekernes Laboratorium For Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 158–59 (7th Cir.1989)).

¶ 46 In *Philmar Mid–Atlantic v. York St. Associates*, 389 Pa.Super. 297, 566 A.2d 1253, 1255 (1989), appellant, the prospective tenant in a failed real estate lease negotiation with appellee real estate owner, argued that its letter of intent imposed a duty upon the owner to negotiate in good faith. We disagreed.

> This duty to negotiate in good faith, appellant contends, was breached when the owner unilaterally withdrew the application for a zoning variance and terminated further negotiations.

> Pennsylvania courts have not considered whether a letter of intent gives rise to an obligation to negotiate in good faith. The Court of Appeals for the Third Circuit, in *Channel Home,* [*supra,*] concluded that under Pennsylvania law such a contract would arise where: (1) both parties had manifested an intention to be bound by the agreement; (2) the terms of the agreement were sufficiently definite to be enforced; and (3) consideration had been given. The court there enforced a duty to negotiate in good faith, with a view toward a formal lease agreement, because the letter of intent contained an unequivocal promise to negotiate.

> Appellant's contention that the letter of intent in this case created a binding promise to negotiate a formal lease must

fail. There is no cause of action to enforce a contract absent a mutual manifestation of assent to be bound. [Citations omitted]. The letter of intent in this case does not disclose any agreement, not even an agreement to negotiate. Instead, it provided specifically that neither party was to be bound until a mutually satisfactory lease had been negotiated and executed.

*Id.*

¶ 47 Here, the parties' May 13th LOI expressly provided that either party could terminate negotiations at any time for any reason without incurring liability to the other prior to the execution of a written contract. It did not contain any provision regarding the duty to negotiate in good faith. Further, the LOI included no provision regarding the Property's "off the market" status. Thus, we conclude, if our courts were to recognize the existence of such a cause of action, that the duty to negotiate in good faith was not breached in this case by Prudential's failure to keep the property "off the market" or to reveal that it was entering negotiations with GSIC.

### D. Promissory Estoppel

¶ 48 The doctrine of promissory estoppel allows a party, under certain circumstances, to enforce a promise even though the promise is not supported by consideration. *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1007 (Pa.Super.1997) (citing *Thatcher's Drug Store, supra*); Restatement (Second) of Contracts § 90. *See also Robert Mallery Lumber Corp. v. B. & F. Assoc., Inc.*, 294 Pa.Super. 503, 440 A.2d 579, 583 (1982) (noting that promissory estoppel has been characterized as a species of or a substitute for consideration). Thus, "[p]romissory estoppel makes promises enforceable." *Crouse v. Cyclops Industries*, 704 A.2d 1090, 1093 (Pa.Super.1997).

A party seeking to establish a cause of action based on promissory estoppel must establish that: "(1) the promisor made a promise that he should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Shoemaker, supra.*

*Id.*

¶ 49 However, the doctrine of promissory estoppel does not apply if the complaining party acted on its own will and not as the result of the defendant's representations. *Ravin, Inc. v. First City Co.*, 692 A.2d 577, 581 (Pa.Super.1997) (citing *First Home Savings Bank, supra*).

¶ 50 The trial court found that the doctrine of promissory estoppel applied to GMH's claims that (1) Prudential promised to keep the Property off the market while negotiations with GMH continued; and (2) Prudential promised to sell the Property to GMH for $107.25 million.

¶ 51 We conclude the court erred in finding these "promises" were enforceable for the same reasons we find that no contract arose and that no fraud was committed. First, the parties agreed that the Property would stay off the market, *inter alia*, as long as GMH was meeting the deadlines it proposed to Prudential. The Property was, in fact, off the market for three months, but GMH could not close within that time. It is clear, in our view, that the negotiations for the sale of the Property did not go as expected by the parties due, in part, to GMH's request for a $3 million reduction in the LOI purchase price and its inability to secure the Allegheny transaction in a timely fashion. We will not conclude that Prudential's "promise" to keep the Property off the market was enforceable in the face of the apparent difficulties the parties encountered in closing the transaction. Since Prudential kept the Property off the market for three months during which time the proposed transaction was not consummated, we do not find the doctrine of promissory estop-

pel available to bind it to continue to keep the Property off the market seemingly indefinitely.

¶ 52 Second, we find that any offer Prudential made on September 9th, to sell the Property to GMH for $107.25 million, was revoked by Prudential's representations of September 10th. Thus, we conclude that there existed no enforceable "promise" to sell the property to GMH for a sum certain.

### E. Conspiracy

The Pennsylvania Supreme Court set forth the elements of civil conspiracy in *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979): "[I]t must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." Proof of malice, *i.e.*, an intent to injure, is an essential part of a conspiracy cause of action; this unlawful intent must also be without justification. *Thompson Coal Co. v. Pike Coal Co.*, *supra*. Furthermore, a conspiracy is not actionable until "some overt act is done in pursuance of the common purpose or design . . . and actual legal damage results[.]" *Baker v. Rangos*, 229 Pa.Super. 333, 351, 324 A.2d 498, 506 (1974) (citations omitted).

*Rutherfoord v. Presbyterian–University Hospital*, 417 Pa.Super. 316, 612 A.2d 500, 508 (1992).

¶ 53 GMH's conspiracy claims were based on the allegation that all defendants conspired to defraud GMH. Because we conclude that no fraud was committed, we correspondingly find that no civil conspiracy to defraud occurred. *See generally Id.* (citing *Rose v. Wissinger*, 294 Pa.Super. 265, 439 A.2d 1193 (1982) (where complaint fails to set forth claim for defamation or outrageous conduct causing emotional distress, there could be no conspiracy to commit those acts); and *Raneri v. DePolo*, 65 Pa.Cmwlth. 183, 441 A.2d 1373, 1376 (1982) (under Pennsylva-

nia law, when a party fails "to sufficiently allege in [other] counts any unlawful act or unlawful means" the conspiracy claim must also fail when it is based on these claims)).

### F. Damages

¶ 54 Because we conclude that the court erred in finding for GMH in its claims for breach of contract, fraud, promissory estoppel, breach of duty to negotiate in good faith and civil conspiracy, we also conclude that the court erred in awarding any damages. In any event, and assuming *arguendo*, that GMH successfully prosecuted its breach of contract and fraud claims, we would nonetheless find that the court's award of damages in the nature of lost profits was error. The only manner of damages available for a successful plaintiff in an action for fraud is actual loss, and not benefit of the bargain. *See Delahanty*, 464 A.2d at 1257. Further, "[I]t is well settled that a party who is injured as a consequence of another party's breach of a valid oral contract subject to the statute of frauds may recover reliance damages only." *Stalnaker v. Lustik*, 1999 PA Super 346, ¶ 10. We find that the court's award of over $20 million in lost profits represented an award for future losses or expectation damages. Thus, we conclude that the court abused its discretion. Finally, we also find that the court abused its discretion by its award of punitive damages. We do not believe that Prudential's conduct, even if proved to be fraud and breach of contract, was so evil or outrageous as to justify a punitive damages award and we conclude, in any event, that the amount of the punitive damages awarded was grossly disproportionate to the actual damages incurred.

### G. Conclusion

¶ 55 For the foregoing reasons, we find that the court's verdict is not sustainable under any of the causes of action set forth by GMH. Accordingly, we reverse the

judgment entered in favor of GMH and remand with directions to enter judgment notwithstanding the verdict in favor of appellants. Jurisdiction is relinquished.

¶ 56 Judge EAKIN files a Dissenting Opinion.

EAKIN, J., dissenting:

¶ 1 While my colleagues' analysis is well reasoned, I find sufficient support in the record for the findings of the learned trial court, and therefore am constrained to dissent.