J-S08043-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

N.A.H.                              :     IN THE SUPERIOR COURT OF
                                    :          PENNSYLVANIA
                                    :
          v.                        :
                                    :
                                    :
                                    :
J.S.                                :
                                    :
          Appellant                 :     No. 1537 WDA 2017

Appeal from the Order Entered September 25, 2017
in the Court of Common Pleas of Fayette County Civil Division at No(s):
1398 of 2017, G.D.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:              **FILED MARCH 16, 2018**

Appellant, J.S. ("Mother"), files this appeal from the Order dated September 21, 2017, and entered September 25, 2017,[1] in the Fayette County Court of Common Pleas, granting the petition of Appellee, N.A.H. ("Putative Father"), to establish paternity and for genetic testing as to E.B.K. ("Child"), born in May of 2017.[2]  After review, we affirm the trial court's order.

_____

[1] The subject order was dated September 21, 2017.  However, the clerk did not provide notice pursuant to Pa.R.C.P. 236(b) until September 25, 2017. Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."  ***Frazier v. City of Philadelphia***, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).
[2] "'This Court accepts immediate appeals from orders directing or denying genetic testing to determine paternity.'"  ***Barr v. Bartolo***, 927 A.2d  635,

_____

*   Former Justice specially assigned to the Superior Court.

The trial court summarized the factual history as follows:

**FACTUAL BACKGROUND**

N.A.H. is a 27[-]year[-]old male who resided with his female friend J.S. "off and on a month or two trying to conceive in a new modern way [. . .via] an at home insemination kit that [Mother] had ordered off the Internet [. . .using] a syringe that had a new design where it wouldn't damage the semen for conception." Roughly a dozen times N.A.H. provided samples of his semen for use in the "Mosie" kit to inseminate Mother. For the act of insemination, N.A.H. would be present in the house and hand his sperm to Mother or would leave his sperm beside Mother's bed in an attempt to make it "less awkward." N.A.H. testified that Mother communicated about the pregnancy by telling him in person and by texting a picture of the positive test. N.A.H. further testified that during the first trimester Mother would text message him calling him "Poppy and Dad." To his knowledge, N.A.H. did not believe that Mother had used any other semen to conceive the child. Once Mother became pregnant "everything started being denied."

In response to the question about his understanding of the arrangement, N.A.H. testified that he and Mother "would more or less be the new modern family. With her being gay and me being gay, we figured that this would be the best way that we can start a new generation as surrounding this child with love from her family and my family."

Following a vacation with her "assumed to be wife [P.K.]," Mother served [N.A.H.] with "more or less a pre-restraining Order to not come in contact with her." N.A.H. elaborated what he described as an "Order" was actually a letter sent regular mail, FedEx mail, and certified mail from Mother's attorney that included a Notice of Defiant Trespass and directed him to contact Mother's attorney if he had any questions or legal issues with Mother. N.A.H. testified that Mother and P.K. became engaged to be married during that vacation, after Mother was already pregnant,

_____

639-40 (Pa.Super. 2007) (quoting **Buccieri v. Campagna**, 889 A.2d 1220, 1220 n.1 (Pa.Super. 2005).

and that P.K. and Mother were not married at the time of conception.

N.A.H., Mother, and P.K. decided to meet in an attorney's office to "sign some paperwork to have everything set in sand regarding the birth of the child." It was at this meeting that N.A.H. learned the proposal excluded him from the child's life except by permission of Mother and that he would not be "known as dad" to the child. On this basis, and with his own counsel representing his interest, N.A.H. refused to execute the document.

Under cross-examination, N.A.H. explained that he and Mother were friends for several years, that he moved out of state and upon returning asked whether Mother was still interested in starting a family with P.K. N.A.H. and Mother had previously talked about starting a family ever since they had become friends. In 2016, aware that Mother was exploring options to conceive, N.A.H. testified that she "chose" him because she knew him. N.A.H. testified that he, Mother, and P.K. discussed the family dynamic and that they would be the "mothers and [he] was going to be father."

N.A.H. testified that based on the discussion with Mother and P.K. that they "were going to have shared [the child] and work with the child and do what's right for the child" and that he "was going to be in the child's life [sic]." Based upon those discussions, N.A.H. agreed to provide his sperm.

N.A.H. admitted they discussed P.K. adopting the child, but they "never moved forward on that." N.A.H. denied agreeing to terminate his parental rights upon the child's birth. N.A.H., Mother, and P.K. "attempted" to draft a three[-]party contract between donor, recipient, and recipient's partner, but it was never "finalized or finished." Counsel for Mother then inquired about the parties' plan to get the document notarized, but N.A.H. testified that it was not notarized because the drafting was never finished. N.A.H. further testified that the three wanted to keep the pregnancy a secret but did not intend to keep secret N.A.H. as being the child's father.

N.A.H. and Mother never signed a written contract. According to N.A.H., the understanding between him and Mother and P.K. was that they "were going to be the mothers and the child would more or less remain at their property, their residence, as primary. [N.A.H.] being the father, [he] was going to be in the child's life and still have [his] legal rights over the child to [. . .]

have vacations with as well as them, have holidays, have time to actually spend with the child and actually help grow the child."

Mother also testified at the time of hearing[,] stating that she and N.A.H. were friends for several years when he left her a voicemail one day asking whether she still wanted to have a baby and offering to help her. Mother and P.K. had been exploring options to conceive including the Cryobank in Pittsburgh, but felt that "it was not as personable." Mother wanted to "have that connection" with P.K. and did not "want to do it at the doctor's office" nor did she "feel like shipping it through the mail was a great idea." Mother also considered adoption.

To proceed with using N.A.H.'s sperm, Mother found an insemination kit online that had "a higher success rate because of the design" and that she could use with the assistance of P.K. and she did actually use the kit eight times to conceive. Mother did not watch N.A.H. make the donation of sperm.

Mother testified that she and P.K. were to be the "parents of the child" and that the discussion was that N.A.H. would "relinquish his parental rights and be involved in the child's life." Mother stated that N.A.H. agreed that P.K. could adopt the child. Mother further testified that the three agreed that she and P.K. would be financially responsible for the child and they would not accept any support from N.A.H. Mother admitted that they agreed to N.A.H. being involved in the child's life and would know the child.

Mother denied that N.A.H. lived with her, rather stating he would spend a few nights when he was leaving his sperm donations. Mother married P.K. in March 2017, two months prior to the child's birth. N.A.H. was not present for the birth and was not included on any paperwork identifying him as the father. Mother testified it was never her intention to include N.A.H. in the pregnancy.

With regards to a written contract, Mother explained the three were drafting the agreement, but they were "all working a lot" and were not rushing it. Mother testified that she and N.A.H. "finalized" the agreement and discussed using a notary but did not want to use one who knew her family. Mother said the agreement was never signed and taken to a notary because they "just couldn't agree on a time and place."

Regarding prenatal doctor's appointments, Mother admitted that N.A.H. wanted to go[,] but she was not comfortable and she wanted only P.K. to attend. Mother stated that N.A.H. changed his phone number and she was only able to reach him on Facebook during a month and a half of the pregnancy, but N.A.H. explained this was because he updated his number by changing it from an Arkansas number to Pennsylvania.

Mother testified that she and N.A.H. discussed that he would relinquish his rights so that P.K. could adopt the baby but that she and P.K. wanted N.A.H. to be involved in the child's life. Mother did not deny that N.A.H. is the father of the child. Mother identified the child as E.B.K. with a date of birth of ….

Based upon this testimony and evidence, this [c]ourt made a factual finding that "there [was] no meeting of the minds" and "that there was no oral agreement because there certainly is evidence according to [N.A.H.] that [this [c]ourt believed] that there was no final agreement reached." Upon this determination, the [c]ourt granted the Petition for Genetic Testing.

Trial Court Opinion ("T.C.O."), 11/7/17, at 2-6 (citations to record omitted) (some brackets in original).

Putative Father filed a Complaint to Establish Paternity and for Genetic Testing on June 29, 2017. The trial court held a hearing on September 21, 2017. Both Putative Father and Mother were represented by counsel and testified on their own behalf.[3] Putative Father additionally presented Exhibits 1 and 2, which were admitted without objection.[4] As previously stated, by

---

[3] Mother filed Preliminary Objections to Putative Father's Complaint on July 18, 2017. At the hearing on September 21, 2017, counsel for Mother amended the Preliminary Objections to be an Answer to the Complaint. Notes of Testimony ("N.T."), 9/21/17, at 2-3, 42.

[4] Exhibits 1 and 2 are not included with the certified record, but are explained in detail on the record and are not dispositive of Mother's issues on appeal. N.T. at 25-28.

order dated September 21, 2017, and entered September 25, 2017, the trial court granted Putative Father's Petition to Establish Paternity and for Genetic Testing. On October 19, 2017, Mother, through counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Subsequently, by order dated and entered October 30, 2017, a stay pending appeal was granted.

On appeal, Mother raises the following issues for our review:

A.     Did the honorable trial court err and abuse its discretion by finding that there was no enforceable verbal contract between the parties relating to sperm donation[?]

B.     Did the honorable trial court err and abuse its discretion by entering an order for genetic testing that is contrary to applicable Pennsylvania law finding that sperm donors are not parents with standing in custody actions[?]

C.     Did the honorable trial court err by finding that the Plaintiff has legal standing in a custody action[?]

Mother's Brief at 5 (unpaginated) (unnecessary capitalization omitted).

We review a trial court's order with regard to paternity for an abuse of discretion or error of law. *Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa.Super. 2007); *see also D.M. v. V.B.*, 87 A.3d 323, 327 (Pa.Super. 2014) (citing *T.E.B. v. C.A.B.*, 74 A.3d 170, 173 n.1 (Pa.Super. 2013); *Barr v. Bartolo*, 927 A.2d 635, 639 (Pa.Super. 2007). With regard to this standard, we have stated:

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's

findings if they are supported by competent evidence. It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

***Vargo***, 940 A.2d at 462 (citing ***Doran v. Doran***, 820 A.2d 1279, 1282 (Pa.Super. 2003)) (brackets in original).

In her first issue, Mother asserts error on the part of the trial court for failing to find a valid oral contract for sperm donation. Mother's Brief at 6 (unpaginated). Generally,

[a]n agreement is an enforceable contract wherein the parties intended to conclude a binding agreement and the essential terms of that agreement are certain enough to provide the basis for providing an appropriate remedy. If the essential terms of the agreement are so uncertain that there is no basis for determining whether the agreement has been kept or broken, there is not an enforceable contract.

***United Envtl. Grp., Inc. v. GKK McKnight, LP***, 176 A.3d 946, 963 (Pa.Super. 2017). Further, we have stated:

"[i]n the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact." ***United Coal v. Hawley Fuel Coal, Inc.***, [ ] 525 A.2d 741, 742 ([Pa.Super.] 1987) (quoting ***Solomon v. Luria***, [ ] 246 A.2d 435, 438 ([Pa.Super.] 1968)).

***Yaros v. Trustees of Univ. of Pennsylvania***, 742 A.2d 1118, 1122 (Pa.Super. 1999). Moreover,

[t]his court is bound by the trial court's findings of fact, unless those findings are not based on competent evidence. ***Thatcher's Drug Store v. Consolidated Supermarkets, Inc.***, 535 Pa. 469, 477, 636 A.2d 156, 160 (1994). Absent an abuse of discretion, we are bound by the trial court's assessment of the credibility of the parties and witnesses. ***Id.*** However, the trial court's conclusions of law are not binding on an appellate court whose

duty it is to determine whether there was a proper application of law to the facts by the trial court. *Id.*

*GMH Associates, Inc. v. Prudential Realty Group*, 752 A.2d 889, 898 (Pa.Super. 2000).

In *Ferguson v. McKiernan*, 596 Pa. 78, 97–98, 940 A.2d 1236, 1248 (2007), the Pennsylvania Supreme Court recognized the enforceability of an oral contract for sperm donation. Critically, in *Ferguson*, the parties expressed "a mutual intention to preserve all of the trappings of a conventional sperm donation, including formation of a binding agreement." *Id.* at 95, 940 A.2d at 1246. The donor agreed to provide his sperm and not seek visitation, and, in exchange, the donee would not seek financial support. *Id.* at 81-82, 1238. As summarized by the Court,

> Former paramours Joel McKiernan (Sperm Donor) and Ivonne Ferguson (Mother) agreed that Sperm Donor would furnish his sperm in an arrangement that, by design, would feature all the hallmarks of an anonymous sperm donation: it would be carried out in a clinical setting; Sperm Donor's role in the conception would remain confidential; and neither would Sperm Donor seek visitation nor would Mother demand from him any support, financial or otherwise. At no time prior to conception, during Mother's pregnancy, or after the birth of the resultant twins did either party behave inconsistently with this agreement, until approximately five years after the twins' birth, when Mother filed a motion seeking child support from Sperm Donor. . . .

*Id.* Therefore, as the parties formed a binding agreement, the Court held such agreement enforceable, stating, ". . . we hold that the agreement found by the trial court to have been bindingly formed, which the trial court deemed nevertheless unenforceable is, in fact, enforceable." *Id.* at 98, 1248.

In the case *sub judice*, the trial court found that Putative Father did not intend to forgo his parental rights. T.C.O. at 7. The court reasoned:

> The [c]ourt was presented with no credible testimony that N.A.H. had agreed to relinquish his parental rights or that he was not the intended father of the child. Mother requested N.A.H. to terminate his legal connection to the child in a meeting in her attorney's office and he refused to do so. N.A.H. testified credibly that he intended for himself, Mother, and P.K. to be the "new modern family" with Mother and P.K. serving as the child's mothers and he the child's father. N.A.H.'s intention, as believed by this [c]ourt, was evidenced by his testimony that he planned to serve as father in the child's life and envisioned future holidays, vacations, helping "grow" the child, and spending time with her.
>
> By her responsive pleadings and testimony, Mother is requesting this court to find N.A.H. acted only as a sperm donor and cites **Ferguson v. McKiernan**, [596 Pa. 78,] 940 A.2d 1236 ([]2007)[,] as controlling precedent regarding the enforceability of oral agreements for sperm donation. However, **Ferguson** is not controlling in a situation such as this, when as a factual determination, this [c]ourt has found that no oral agreement as entered between the parties. As counsel for Mother argued in closing, "[t]here was an attempt to validify (*sic*) this agreement, these terms, to writing." The alleged agreement never manifested, rather remained only in negotiations. This conclusion is evidenced by the testimony throughout referring to N.A.H. or Mother's "understanding" of the agreement, or the "discussions" between the parties best highlighted by N.A.H.'s description as the agreement being set in "sand."
>
> In support of this [c]ourt's conclusion that no oral agreement existed to find N.A.H. acted only as a sperm donor, the attempt by Mother to render her alleged agreement to writing to effectuate the relinquishment of rights to the child was specifically denied by N.A.H. in person and in the presence of each of their attorneys. Mother's testimony that the agreement was not executed because she and N.A.H. were "working a lot" or that they could not agree on a notary to witness their signature is not credible and was not believed by this [c]ourt. Accordingly, this [c]ourt has found as a factual determination that Mother and N.A.H. had "no meeting of the minds" to sever his paternal

relationship with the child and as such, will not "write the contract for the parties."

*Id.* at 7-8 (citations to record omitted).

Mother argues that a sperm donor and a recipient may enter into an enforceable oral contract. Mother's Brief at 6 (unpaginated). In doing so, Mother relies on *Ferguson* and asserts that, in the instant matter, "the record reflects the intention and agreement of the parties prior to the act of insemination." Mother's Brief at 6. She suggests that despite having entered into an agreement prior to conception, Putative Father later changed his mind. *Id.* at 10, 14. Mother concludes:

> N.A.H. and J.S. entered into an enforceable oral contract wherein N.A.H. would donate his sperm to J.S. for the purpose of at[-]home artificial insemination. Additionally, the parties agreed that N.A.H. would not be responsible for child support of any child/ren conceived by J.S., that J.S. and her wife, P.K. would be the Mothers of the child/ren and that P.K. would adopt any child/ren that would be born to J.S. J.S. chose to use sperm from N.A.H. as she wanted to know the donor, his background and history and to be able to have any resulting child/ren know the donor. The resulting agreement between the parties, despite it's [sic] lack of reduction to writing, remains an enforceable agreement. It is clear that N.A.H. was intended to be a sperm donor without any rights to child custody of any resulting child/ren, despite his change in position at a later date. . . .

*Id.* at 14. We disagree, for upon review of the certified record, we discern no abuse of discretion with regard to the trial court's determination that there had been no enforceable oral contract for sperm donation. The record supports its finding that there was no meeting of the minds to enter into such an agreement when Putative Father provided his sperm.

To the contrary, Putative Father testified he desires to be in Child's life and support Child financially. N.T. at 10. According to Putative Father, the parties' intent was to raise Child together, with Mother and her now-wife as the mothers and with him as the father. *Id.* at 6, 18. He explained his understanding as follows:

Q. What was your understanding, as you understood it, with [Mother] as to what would happen once the child was born?

A. That we would more or less be the new new modern family. With her being gay and me being gay, we figured that this would be the best way that we can start a new generation as surrounding this child with love from her family and my family.

Q. Is was your belief that she intended to raise the child with you?

A. Yes.

*Id.* at 6. In support thereof, Putative Father indicated that Mother referred to him as "Dad and Poppy." *Id.* at 10.

On cross-examination, Father testified that neither party intended to bring an action for child support "because we were going to have shared [sic] and work with the child and do what's right for the child." *Id.* at 19. Although he acknowledged he had agreed that Child would take Mother's now-wife's last name and that the prospect of adoption had been discussed, Putative Father expressed that the parties "never moved forward on that." *Id.* at 18-19, 21. There was never any agreement that he would relinquish his parental rights. *Id.* at 19. Rather, as Putative Father described:

[Mother and her partner] were going to be the mothers and the child would more or less remain at their property, their residence, as primary. Me being the father, I was going to be in the child's

- 11 -

life and still have my legal rights over the child to, you know, have vacations with [me] as well as them, have holidays, have time to actually spend with the child and actually help grow the child.

*Id.* at 29.

Although Putative Father conceded that he and Mother worked on and attempted to prepare a written agreement, he stated that such document was "never finalized or finished." *Id.* at 22-23. In addition, Putative Father confirmed that an agreement ultimately presented to him by counsel for Mother, which provided for his participation in Child's life "by permission basis only" and where he was not known as Child's father, did not "conform to what [his] expectations of the relationship to [his] child was going to be[.]"[5] *Id.* at 9-10.

Conversely, Mother testified that she, her partner and Putative Father discussed adoption and agreed that while Putative Father would "be involved in the child's life[,]" Mother and her partner would "be the parents of the child." *Id.* at 35-36, 40. Significantly, Mother admitted that she told Putative Father he could still see his child "because we wanted him to be involved in her life" and wanted her "to have a male figure in her life." *Id*. at 40. Moreover, Mother stated that the attempted written agreement, although not signed or notarized, was in fact finalized. *Id.* at 38. Importantly, in response to questioning from the trial court, Mother did not dispute that Putative Father is Child's father. *Id.* at 41.

_____

[5] Putative Father did not sign this agreement. N.T. at 9.

- 12 -

In light of the foregoing, we find the trial court was within its discretion to accept Putative Father's testimony and conclude that there was no enforceable oral contract for sperm donation. As we discern no abuse of discretion or error of law with regard to the trial court's determinations, we do not disturb them. Mother's first claim, therefore, fails.

Next, we examine Mother's second and third issues. In her second issue, Mother appears to suggest that Putative Father was a sperm donor pursuant an enforceable contract, and, therefore, not a parent.[6] Mother's Brief at 14 (unpaginated). However, she has failed to preserve this challenge in that she presents no argument or discussion supported by citation to relevant legal authority related thereto in her appellate brief. Instead, Mother merely restates her second claimed error without further comment. In her third issue, Mother attempts to raise a challenge on the basis of her marriage prior to Child's birth.[7] *Id.* at 15. While she sets forth a single-paragraph argument in support of this claim in her brief, Mother again does not provide citation to relevant legal authority therein. As such, we find that Mother has waived her second and third issues, and we, therefore, will not address them. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611

---

[6] We recognize that Mother's second argument is closely related to her first argument.

[7] While Mother raised this issue in her Preliminary Objections to Putative Father's Complaint, *See* Defendant's Preliminary Objections To Plaintiff's Complaint, 7/18/17, at ¶¶5, 6, which was amended to an Answer, N.T. at 42, Mother failed to address or raise this issue further at the hearing.

Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017).

For the foregoing reasons, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/16/2018