J-A24021-17 & J-A24022-17 & J-A24023-17

2017 PA Super 399

| UNITED ENVIRONMENTAL GROUP, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| GKK MCKNIGHT, LP, A PENNSYLVANIA LIMITED PARTNERSHIP, GKK CAPITOL, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY, GOLDEN OIL COMPANY, A PENNSYLVANIA CORPORATION, AND KEHM OIL COMPANY, A PENNSYLVANIA CORPORATION | |
| | No. 1956 WDA 2016 |

Appeal from the Judgment Entered November 30, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 10-010292

| UNITED ENVIRONMENTAL GROUP, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| GKK MCKNIGHT, LP, A PENNSYLVANIA LIMITED PARTNERSHIP, GKK CAPITAL, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY, GOLDEN OIL COMPANY, A PENNSYLVANIA CORPORATION, AND KEHM OIL COMPANY, A PENNSYLVANIA CORPORATION | |
| | No. 294 WDA 2017 |

Appeal from the Judgment Entered November 30, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 10-010292

J-A24021-17 & J-A24022-17 & J-A24023-17

| | |
|---|---|
| UNITED ENVIRONMENTAL GROUP, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GKK MCKNIGHT, LP, A PENNSYLVANIA LIMITED PARTNERSHIP, GKK CAPITAL, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY, GOLDEN OIL COMPANY, A PENNSYLVANIA CORPORATION, AND KEHM OIL COMPANY, A PENNSYLVANIA CORPORATION | |
| APPEAL OF:  GOLDEN OIL COMPANY AND KEHM OIL COMPANY | |
| | No. 55 WDA 2017 |

Appeal from the Judgment Entered November 30, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 10-010292

| | |
|---|---|
| UNITED ENVIRONMENTAL GROUP, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GKK MCKNIGHT, L.P., A PENNSYLVANIA LIMITED PARTNERSHIP, GKK CAPITAL, LLC A PENNSYLVNIA LIMITED LIABILITY COMPANY, GOLDEN OIL COMPANY, A PENNSYLVANIA CORPORATION, AND KHEM OIL COMPANY, A PENNSYLVANIA CORPORATION | |
| APPEAL OF: GKK MCKNIGHT, L.P. AND GKK CAPITOL, LLC | |
| | No. 82 WDA 2017 |

- 2 -

J-A24021-17 & J-A24022-17 & J-A24023-17

Appeal from the Judgment Entered November 30, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 10-01-010292

BEFORE: BENDER, P.J.E., MOULTON, J., and SOLANO, J.

OPINION BY SOLANO, J.:                          Filed:  December 15, 2017

This is an action by United Environmental Group, Inc. for damages relating to environmental remediation services that it performed at property on McKnight Road in Ross Township, Allegheny County, the former site of a gas station.  There are two groups of defendants:  (1) GKK McKnight, LP, a Pennsylvania limited partnership, and GKK Capital, LLC, a Pennsylvania limited liability company (together, "GKK"); and (2) Golden Oil Co., a Pennsylvania corporation, and Kehm Oil Co., a Pennsylvania corporation (together, "Golden").  Following a jury trial, United obtained a judgment in its favor against all defendants.  At Docket Nos. 1956 WDA 2016 and 294 WDA 2017, United appeals from that judgment because it failed to include all of the elements of recovery that it sought.  At Docket No. 55 WDA 2017, Golden cross-appeals from the judgment in favor of United.  At Docket No. 82 WDA 2017, GKK cross-appeals from the rejection of its cross-claim against Golden.  We vacate the judgment at Nos. 1956 WDA 2016 and 294 WDA 2017 and remand for further proceedings.  We affirm the judgment at Nos. 55 WDA 2017 and 82 WDA 2017.

Golden owned the gas station at the Ross Township property until 2007, when it sold the property to GKK.  There were several underground tanks on the property that were used to store gasoline, and, prior to the

- 3 -

sale, Golden asked United, a company that excavates tanks and does environmental cleanup for gas stations, to submit quotes for the removal of the tanks on the property.

Golden and United had done business in the past. At trial, United's president, Stephen Klesic, testified to United's longstanding business relationship with Golden and its president, George Kehm:

> [Q]   . . . How long has [United] done work for Mr. Kehm and his companies? You said about 30 years?
>
> A   Over 30 years, it was in the early '70s – or late '70s early, '80s.
>
> Q   Do you recall how many projects or jobs you've done in that time period for him?
>
> A   From service calls to tank installations to tank removals, probably over a thousand.
>
> Q   And how did these jobs typically start? Who arranged them?
>
> A   We would either get a call from Mr. Kehm or his secretary, Kathy. If it was a service call, you know, usually in the morning between 6 and 7:00 a.m., we were in, George [Kehm] was in, Kathy was in. We'd get a call because he's checking with his stations and there was a problem at one of the stations that needed maintenance. If it was something other than a general maintenance issue, we may get a fax, hey, we have facility operations inspections which are required by PADEP [the Pennsylvania Department of Environmental Protection], they are to be done every three years. And we would get a fax, hey, these inspections are up for our facility and we need to do them and get them scheduled.
>
> Q   And how were you typically paid for these jobs?
>
> A   We were typically paid in 30 days or less.
>
> Q   From your invoice?

A       From my invoices.

Q       When you sent an invoice from [United], did it typically have an interest rate on it?

A       Yes, our invoices were zero percent discount zero days, net ten, and then a one-and-a-half percent 30 days — or interest per month.

N.T., 5/11/15, at 56-57. Simply stated, after thirty days, United would charge 1.5% interest per month on the balance. *Id.* at 58.

Kehm testified that United typically would invoice Golden for its services, and Golden would pay United and obtain reimbursement from Pennsylvania's Underground Storage Tank Indemnification Fund, a fund established by the Commonwealth to assist with the removal of underground petroleum storage tanks. *See* N.T., 5/11/15, at 102-03.[1] Since 1994, Kehm had been involved in about fifty remediations that involved the Tank

---

[1] This Court discussed the Tank Fund in *Wagner v. Erie Ins. Co.*, 801 A.2d 1226 (Pa. Super. 2002), *aff'd*, 847 A.2d 1274 (Pa. 2004) (*per curiam* order):

In 1989, Pennsylvania enacted the Storage Tank and Spill Prevention Act ("STSPA"), 35 P.S. §§ 6021.101–6021.2104, which included creation of the Underground Storage Tank Indemnification Fund [("Tank Fund")], 35 P.S. §§ 6021.704-708. The purpose of the Fund was to make "payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a sudden or nonsudden release from underground storage tanks and for making loans to owners as authorized by this act."

*Id.* at 1228 (footnote and some citations omitted). Klesic testified that Golden sometimes would request reimbursement from a third party other than the Tank Fund. N.T., 5/12-13/15, at 73.

Fund, and he testified that he had never had the Fund deny reimbursement. *Id.*

Paragraph 10 of the August 2007 agreement for sale of the property from Golden to GKK provided as follows:

> Seller's Expenses: Seller shall be responsible for cost of deed preparation and all matters of title clearance. Seller shall also be responsible for bringing the Property into compliance with the applicable Pennsylvania Department of Environmental Protection's Underground [Storage Tank] (UST) regulations for site closure.

Ex. C. at ¶ 10 to United's Fourth Am. Compl., 2/29/12.  Closing on the sale of the property occurred in August or September of 2008, and around that same time, Kehm directed United to submit its quote for removal of the tanks to Jonathon Kamin, GKK's manager. The quote estimated a cost of $13,567 to remove the storage tanks and any contaminated material and to fill the resulting hole with uncontaminated soil.  In pertinent part, the estimate provided, "This work will be handled on a Time & Material basis, while all costs associated with the removal of the contaminated material should be covered under [the Tank Fund] with a $5,000 deductible per release, it is ultimately the owner[']s responsibility for these additional expenses."  Ex. A to Fourth Am. Compl., 2/29/12.  The estimate did not include an integration clause.  GKK signed the estimate next to the word "Accepted."  *Id.*  Although the signature is not dated, GKK apparently signed on September 22, 2008.  *See* N.T., 5/11/15, at 82.

United began work the next day and almost immediately discovered contaminated soil.  N.T., 5/11/15, at 83.  United promptly notified GKK,

Golden, the Pennsylvania Department of Environmental Protection ("DEP"), and the Tank Fund, in order to initiate a formal claim for reimbursement. *Id.* at 83. During the course of remediation, United discovered additional storage tanks that had to be removed. *Id.* at 87. According to United, GKK and Golden directed United to perform the work needed to remediate the contamination that it found and represented that its invoices would be paid. *Id.* at 70-72.

In this connection, Golden's counsel cross-examined Klesic of United regarding the basis for its claim against Golden (which counsel personalized in his questions by referencing Golden's president, Kehm) and whether United contended that it was suing under the remediation contract that Klesic (for United) had signed with Kamin of GKK:

Q. Do you know what contract you are suing Mr. Kehm under?

A. It is my understanding that that contract, as it is there, was with Mr. Kamin. Mr. Kehm had guaranteed the cleanup of the site to Mr. Kamin, and then subsequently ordered me to, basically, do whatever is necessary to keep Mr. Kamin happy and clean up the property.

Q. Just to be clear, you are not suing Mr. Kehm under this contract?

A. It is a supplement to that contract.

N.T., 5/12/15, at 4-5. Klesic did not otherwise elaborate.

United completed remediation in 2010, and the DEP approved United's remediation work in 2012. N.T., 5/11/15, at 118-19. United sent invoices for its remediation work to GKK, Golden, or (in most cases) both of them. The invoices totaled $350,000. GKK tendered payment of $17,390.55. GKK

requested reimbursement from the Tank Fund, but because GKK failed to timely submit a claim, GKK's request for reimbursement was denied on June 10, 2009. N.T., 5/11/15, at 108-10.[2] GKK asked the Tank Fund's executive director to review the denial, but the Tank Fund reaffirmed its decision. *Id.* at 112. GKK missed the deadline to further appeal the Tank Fund's decision. N.T., 5/12-13/15, at 103.

Meanwhile, on June 30, 2009, Golden paid United $100,000 as partial payment for the cleanup of the property, which left approximately $230,000 of unpaid invoices. N.T., 5/11/15, at 129. Golden's check included a notation that it was "paid under protest." When asked about this notation, Klesic (United's president) testified:

[Q:] What did you take the "paid under protest to mean"?

A    [Golden] felt that the [Tank Fund] should be paying for the cost of cleanup on this as did I because per the regulations and the guidance, it should have been covered. We provided documentation to refute the claims.

N.T., 5/11/15, at 115. Klesic later explained:

A    My understanding was [that the $100,000 check] was a partial payment on the cleanup for the McKnight Road site. And that if [GKK] was successful in the appeal with the fund and the fund decided to pay, if they paid us for that work, we would reimburse the portion back to [Golden], or there was a letter written to [Golden] that he could submit[.]

---

[2] The Tank Fund said it also denied reimbursement because "a prior release was reported by the DEP and no release of liability was granted." N.T., 5/11/15, at 109.

*Id.* at 116.  The last four invoices for the remediation were sent only to GKK because Golden indicated it would pay no more invoices.  N.T., 5/11/15, at 101.

At trial, however, Golden's president, George Kehm, testified that it was Golden's responsibility to pay for the remediation:

> [Q. by GKK's counsel]. . . . Golden Oil entered into a contract with GKK McKnight for the purchase of the McKnight property; is that correct?
>
> A. That is correct.
>
> Q. And in a deposition you gave in this case, you stated it was Golden Oil's responsibility to pay for the cleanup costs?
>
> A. That is correct.
>
> Q. Is that still your understanding?
>
> A. That is still correct.  I'll tell you why. It was so that [the Tank Fund] paid these 50 other accounts or 50 odd accounts and always paid them.  So why wouldn't they pay this one?

N.T., 5/12-13/15, at 146.  Kehm stood by his deposition testimony in which, when asked, "what was your understanding of your responsibility with the underground storage tanks and transferring this property to GKK," he responded:  "I informed them that it was my responsibility.  It is the law that I have to be responsible for it. . . ."  *Id.* at 151-52.

Eventually, United sued both GKK and Golden for the balance due on its invoices.  In its fourth amended complaint ("Complaint"), it asserted claims for breach of contract, unjust enrichment, continuing services, and damages under the Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. §§ 501–516.  The contract claim was based on the written contract

between GKK and United (Exhibit A to the Complaint) and several invoices and other documents in which GKK or Golden authorized United's work. United's Fourth Am. Compl., at ¶ 29. United alleged:

> Despite repeated demands for payment and repeated promises for payment, Defendants have failed and refused to pay the full amounts due on the contract as set forth on the invoices, and as summarized by the Statement of Past Due Account attached hereto as Exhibit "B", and there remains due and owing the amount of $180,093,40 plus interest of $40,510.74 through May 11, 2010 for a total of $220,804.14 as of May 11, 2010 plus further interest as provided by agreement and practice, and costs as provided by law.
>
> WHEREFORE, Plaintiff demands joint and several judgment against all Defendants in the amount of Two Hundred Twenty Thousand Six Hundred Four Dollars and 14 Cents ($220,604.14) plus further interest as provided by agreement and practice, and costs as provided by law.

*Id.* at ¶ 30 & Ad Damnum Cl. In Count IV, which alleged the CASPA claims, United averred that it was "a contractor that performed construction work in accordance with a contract with the Defendants," but it did not specifically identify the contract. United alleged that its invoices for its work had not been paid. *Id.* at ¶¶ 46-52. United continued:

> 53. As a result of the Defendants' failure to timely pay Plaintiff for work performed and invoiced (less the prior amounts paid to Plaintiff by the Defendants and less the amounts paid to Plaintiff by USTIF), the Defendants owe interest at one percent (1%) per month as required by the agreement with Plaintiff, and a statutory penalty of one percent (1%) per month as required by the terms of the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA")[,] 73 P.S. §501, et[] seq.
>
> 54. As a result of the above averments, Plaintiff asserts its right to receive:
>
> (a) Full payment of its invoiced amounts, less the prior partial amounts paid to Plaintiff; and,

(b) Interest at one percent (1%) per month; and,

(c) Statutory penalty at one percent (1%) per month of the wrongfully withheld amounts as required by the terms of CASPA; and,

(d) Plaintiff's reasonable attorney fees as allowed by the terms of the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA")[,] 73 P.S. § 501, et[] seq.

*Id.* at ¶¶ 53-54.

Golden filed an answer and counter-claim that contended that Golden paid $100,000 to United under false pretenses. Golden's Answer, New Matter, and Countercl. to Fourth Am. Compl., 4/2/12, at 16. At trial, Golden clarified the scope of that counter-claim through its cross-examination of Klesic. In his testimony, Klesic acknowledged that the Tank Fund had accused United of billing for unnecessary work on several projects and was refusing to reimburse United for that reason. N.T., 5/12-13/15, at 15-17. Klesic said that he notified Kehm that the Tank Fund was making false accusations, but not the substance of those accusations. *Id.* at 43-44. As a result of the Tank Fund's assertions, United had cash flow issues and asked Golden to pay the $100,000. *Id.* at 40-41. According to Klesic, Kehm was aware of rumors "throughout the industry" about United's problems, but United did not notify Kehm of the details. *Id.* at 40-41, 44. Klesic denied telling Kehm that United would repay the $100,000; rather, Klesic insisted that United would repay whatever amount the Tank Fund reimbursed, as United would not "get paid twice for the same work." *Id.* at 42. In sum, Golden accused United of inducing it to pay on the false understanding that

the Tank Fund would provide reimbursement. Golden also contended that United breached an agreement to return the money. *Id.*

GKK also filed an answer denying liability. In addition, it filed a cross-claim against Golden. GKK's Answer, New Matter, and Cross-cl. to Fourth Am. Compl., 4/3/12, at ¶¶ 62-67. The cross-claim contended that, under Golden's written agreement to sell the property to it, Golden was responsible for bringing the property into compliance with state regulations. *Id.* at ¶¶ 63, 66. GKK contended that if United were to prevail, GKK was entitled to indemnification and contribution from Golden. *Id.* at ¶ 67.

On September 19, 2014, United filed its pretrial statement. United's Pretrial Statement, 9/19/14, R. 613a. In that statement, United summarized the damages it sought on each of its four claims:

Recap of Amounts Claimed (Excluding Costs & Attorney Fees):

| | |
|---|---|
| Principal through date Initial Complaint Filed [Count] I | $180,093.40 |
| Principal for Continuing Services [Count] III | 50,287.54 |
| TOTAL PRINCIPAL OWED Under Contract | **$ 230,380.94** |

| Interest Owed through November 2014 | |
|---|---|
| Contract Rate of 1½% Counts I & III | **$382,913.66** |
| CASPA Interest Rate of 1% | $311,936.98 |
| CASPA Penalty of 1% | 311,936.98 |

Total  CASPA  Amount                                         **$623,873.96**
Count IV

*Id.* at 11, R. 623a.  The claimed damages (the sum of the three amounts shown in bold type) total $1,237,168.56.  ***See id.***

On May 11, 2015, prior to trial, the court considered several motions in *limine*.  One of those was a motion by Golden and GKK to strike United's CASPA claim.[3]  GKK reasoned that because all defendants tendered payments in various amounts, CASPA did not apply.  Golden argued that because it was not the property's owner, as defined by CASPA, it was not liable under CASPA.  After reviewing the motion, the trial court stated that it would "hold this motion in abeyance until the testimony, but suggested to the parties that this particular issue may be better suited to be argued post-verdict."  N.T., 5/11/15, at 12, R. 843a.  All counsel agreed to "that sort of bifurcation."  *Id.* The trial court and the parties have characterized the trial court's decision to hold the CASPA motion in abeyance until after trial as a decision (or a "stipulation") to postpone consideration of **all** CASPA issues until after trial.  ***See, e.g.***, Trial Ct. Op. at 3; United's Brief at 30 (characterizing it as a "stipulation"); GKK's Brief at 8.  As a result, no party submitted any evidence to the jury on any issue under CASPA.

A jury trial was held on the breach of contract issues from May 11 to May 13, 2015.  United's opening statement stressed that an award of

_____

[3] Not every motion in *limine* was filed and this appears to have been an oral motion, but the court, in its ruling, summarized the arguments made by GKK and Golden.  N.T., 5/11/15, at 11.

interest on any damages for breach of the remediation contract was important: "The interest is important to plaintiff because it had to borrow money, and had to pay its employees, its vendors and subcontractors at the disposal site who provided services for this project. These people have all been paid by the plaintiff." N.T., 5/11/15, at 40. The interest that accrued on the unpaid amounts was developed extensively via testimony and exhibits.

During trial, the court entered a nonsuit on United's unjust enrichment and continuing services claims. United's counsel closed with the following argument, in part: "We are asking that you get the Plaintiff paid for the rest of his work, the rest of the Plaintiff's work that was promised to the Plaintiff, and award the Plaintiff a requested amount, which is $230,380.94, plus the interest on the invoices against the Defendants." N.T., 5/12-13/15, at 213.

On May 13, 2015, the jury found that GKK breached its contract with United and awarded United $158,000 on its claim against GKK. Jury Verdict, 5/13/15, at 1 (Questions 1-2). The jury also found that the two Golden companies breached a contract with United and awarded United total damages of $75,000 on its claim against those companies. *Id.* at 2 (Questions 5-8).[4] Together, these damage awards totaled $233,000. *Id.* at 2 (Question 9). By awarding this amount, the jury did not award United the $382,913.66 in contractual interest that United had sought to recover. The

---

[4] The jury awarded $37,500 against Golden Oil and $37,500 against Kehm Oil.

jury found in favor of United on Golden's counterclaim against it. *Id.* at 3 (Questions 10-11). The jury also found that Golden was not liable to GKK "as a result of the sales agreement" between Golden and GKK. *Id.* at 1 (Question 3).

After the jury reached its verdict, the court held a short argument regarding GKK's motion to strike the CASPA claim and then ordered the parties to file briefs. N.T., 5/12-13/15, at 239-40. No party submitted additional evidence to the trial court.

On May 22, 2015, United filed a post-trial "motion to complete the verdict"[5] and a brief addressing United's CASPA claims and GKK's cross-claim. United asked the court to award it interest, penalties, and attorneys' fees under CASPA and argued that it had fulfilled all of the statutory requirements for that recovery. United's Post-Trial Brief on CASPA, 5/22/15, at 3-4. United's brief presumed that because the jury found breaches of contract, it was necessary only for it to establish that it fulfilled CASPA's other statutory requirements; United did not identify or otherwise discuss the written or oral agreement that formed the basis for its CASPA claim. *See id.* at 2-7. Also, United claimed that the defendants neglected to ask the jury to resolve GKK's cross-claim against Golden, and, because the

---

[5] In light of the hybrid nature of the trial proceedings (jury and non-jury), the titling of United's motion is questionable. *See Sands v. Andino*, 590 A.2d 761, 764 (Pa. Super.) (explaining: "it was procedurally impossible for a verdict to have been entered in the action against [the defendant] because the case was tried before a judge sitting without a jury[, and in] such instances, the trial court renders a **decision**, not a **verdict**" (emphases in original)), *appeal denied*, 600 A.2d 1259 (Pa. 1991).

cross-claim was omitted from the jury slip, it "should be treated as a waiver of Defendants' jury trial rights with regard to this Cross-Claim." United's Mot. to Complete the Verdict, 5/22/15, at ¶¶ 5-6. United contended that the testimony and documents necessary for resolving the cross-claim were in the record and that the court should enter judgment on the cross-claim in favor of GKK and against Golden. *Id.* at ¶¶ 8-9.

GKK moved for judgment notwithstanding the verdict or for a new trial on the basis that Golden was liable to GKK. Golden also filed a motion for judgment notwithstanding the verdict on the basis that there was no written contract between Golden and United and United's invoices could not form the basis for any contract action.

The court did not rule on any of these post-trial motions within 120 days, but no party praeciped for entry of judgment after 120 days elapsed. *See* Pa.R.C.P. 227.4.[6] About six months after the jury's verdict, on November 17, 2015, United, without leave of court, filed a supplemental brief on the CASPA issues. Relying on Paragraph 10 of the agreement of sale, the supplemental brief asserted that Golden was an "owner" of the property for purposes of CASPA. The brief also asserted that Golden "retained and exercised the supervisory rights of an owner by approving" United's invoices and work, as well as by making a partial payment to United

---

[6] We note that Pa.R.C.P. 1038(c) states that the "trial judge shall render a decision within seven days after the conclusion of the trial except in protracted cases or cases of extraordinary complexity."

of $100,000 for the remediation work. United's Supp. Brief on CASPA, 11/17/15, at 3.

On January 19, 2016, United filed a motion to supplement its CASPA damages claim to include post-verdict damages, a request for oral argument, or, alternatively, leave to file a supplemental reply brief to the post-trial briefs filed by GKK and Golden (which were filed in May of 2015). On February 2, 2016, Golden objected to the request for additional briefing. The docket reflects no filings for the next eight months. On October 6, 2016, the court ordered oral argument and directed GKK and Golden to file briefs in opposition to United's briefs; GKK and Golden both complied.

On December 1, 2016, in three separate orders, the court denied all defendants' post-trial motions, as well as United's "Motion to Complete the Verdict." In a memorandum opinion, the court agreed with Golden that there was "slight evidence in this case to conclude that Golden [was] obligated to have payments to [United] pursuant to any written contract." Trial Ct.'s Mem. Op., 12/2/16, at 3. The court opined that United's CASPA claim against Golden was based on Paragraph 10 of the sales agreement between Golden and GKK for the property. *Id.* The court reasoned that because the jury, in Question 3 on the verdict sheet, found that Golden did not breach the sales agreement, it "would seem to preclude any finding that Golden . . . should be liable to [United] under CASPA." *Id.* The court also stated that United failed to prove that Golden qualified as a contractor under CASPA. *Id.* at 4-5.

The trial court did not opine on whether there was contractual support for United's CASPA claim against GKK. Instead, it held that the CASPA claim against GKK failed because the jury awarded United only $158,000, rather than the $1,237,168.56 that United had demanded prior to trial, meaning that United was not a "substantially prevailing party." Trial Ct.'s Mem. Op., 12/2/16, at 5-6.[7] The court also reasoned that the jury's combined verdict of $233,000, is "near equivalent" to United's alleged damages of $230,380.94. *Id.* at 5.[8] The trial court explained:

> Quite apart from the jury's failure to award other aspects of the remedy sought by [United], the rejection of the claim for interest suggests a significant limitation by the jury of [United's] claim. [United] had stressed the value of the contractual interest from its opening remarks, asserting that six years of interest was due and that "[t]he interest is important because [United] had to borrow money and pay its employees, its vendors and subcontractors at the disposal site who provided services for this project" [(quoting United's opening argument at N.T., 5/11/15, at 40)]. Yet, the jury elected not to award interest.

Trial Ct. Op. at 5-6. The court also opined that the jury's refusal to award interest to United on its breach of contract claim "repudiated a fundamental aspect" of that claim, which the court described as "relief more in the nature

---

[7] As noted above, United claimed total damages of $230,380.94 on its breach of contract and continuing services claim. United's Pretrial Statement, 9/19/14, at 11, R. 623a. United claimed contractual interest of $382,913.66, and additional CASPA damages of $623,873.96.

[8] We note that the damages awarded actually exceeded the requested amount, because the court granted a non-suit for the continuing services claim, for which United had requested damages of $50,287.54.

of a verdict for unjust enrichment." *Id.* at 6.[9]  The court stated that United did not substantially prevail on that issue.  *Id.* at 6.

On December 12, 2016, United filed another post-trial motion seeking judgment notwithstanding the verdict on its CASPA claims.  In United's view, the jury found that Golden was liable for a breach of contract, and it did not matter if the contract was written or oral.  United's Post-Trial Mot., 12/12/16, at 5.  Thus, United reasoned, the court erred by concluding there was "slight" evidence of a "written contract."  *Id.* at 3 (referencing Trial Ct.'s Mem. Op., 12/2/16, at 3).  United contended that the court improperly relied on Paragraph 10 of the sales agreement between GKK and Golden as a basis for United's breach of contract claims against Golden.  *Id.* at 5.  Instead, United insisted, its contract claims were based on GKK's and Golden's representations to United and their "signed approval" of United's invoices. *Id.*  United reiterated that the jury's verdict slip confirms the existence of a contract between United and GKK and United and Golden.  *Id.* at 5-6.

Golden filed a brief in opposition, contending, among other things, that United's December 12, 2016 post-trial motion was untimely.  GKK filed a motion to strike United's second post-trial motion on that same basis.

Before the court ruled on United's December 12, 2016 post-trial motion, United filed a notice of appeal on December 28, 2016 (docketed in this Court as No. 1956 WDA 2016).  On January 3, 2016, the trial court

---

[9] As previously noted, the court had a granted nonsuit on United's claim for unjust enrichment.

denied United's second post-trial motion. On January 9, 2016, Golden filed a cross-appeal (docketed in this Court at No. 44 WDA 2017); GKK filed a cross-appeal on January 11, 2016 (docketed at No. 82 WDA 2017).

United filed praecipes to have the court enter judgment in favor of United and against all defendants with respect to the jury's verdict. The praecipes did not address the cross-claim for indemnification and contribution by GKK against Golden; neither GKK nor Golden asked the court to enter judgment on the cross-claim. The court subsequently entered judgment as set forth in the praecipes.

On January 26, 2017, United moved to have the court enter judgment on a verdict supposedly rendered on December 1, 2016, when the court denied United's motion to complete the verdict. The court granted the motion on February 3, 2017, and entered judgment against United and in favor of all defendants on United's CASPA claims. The order did not enter judgment on GKK's cross-claim for indemnification and contribution against Golden. United filed an appeal from that judgment on February 15, 2017 (docketed in this Court at No. 294 WDA 2017), and we later consolidated that appeal with United's earlier appeal.

On February 27, 2017, the trial court issued another opinion that substantially repeated the reasoning in its December 1, 2016 memorandum opinion. With respect to GKK's motion for judgment notwithstanding the verdict, the court stated that the jury apparently ruled in favor of United on the claim against GKK because it "conclud[ed] that Defendants benefitted

from [United's] work." Trial Ct. Op., 2/27/17, at 7. With respect to GKK's cross-claim against Golden for indemnification under Paragraph 10 of the sales agreement, the court stated that the jury's rejection of that claim in its verdict may have been based on its conclusion that Golden's $100,000 payment to United may have satisfied its obligation to GKK. *Id.* at 7-8.

On April 19, 2017, the trial court issued one more opinion pursuant to Rule 1925(a) of the Rules of Appellate Procedure. The court incorporated its opinion of February 27, 2017, but added a "further observation" that it would be error to rule on a CASPA claim "without first holding a hearing and arriving at a determination as to whether a defendant's withholding of payment was a good faith withholding for perceived deficiencies." Trial Ct. Op., 4/19/17, at 3. The court added that the jury's rejection of United's claim for interest "would seem to have answered to a great degree the question of whether payments had been appropriately withheld." *Id.*

On November 28, 2017, recognizing that the parties overlooked entering judgment on the cross-claim at No. 82 WDA 2017, this Court ordered the parties to file a praecipe for judgment with the trial court. The parties complied on November 30, 2017. Under Pa.R.A.P. 905(a)(5), the previously filed notices of appeal are treated as if filed following the entry of judgment. The appeals and cross-appeals therefore are now properly before this Court.

**NOS. 1956 WDA 2016 AND 294 WDA 2017
(UNITED'S APPEAL)**

United raises the following issues:

1. Where the jury found that each of the defendants were liable under a breach of contract theory, did the trial court err in denying plaintiff CASPA interest, penalties, and attorneys' fees based upon its determination that there was "slight evidence" of a written contract?

2. Did the trial court err in determining that it was an indispensable predicate to a CASPA claim for interest and penalties that a claimant be a "substantially prevailing party"?

3. Where the plaintiff recovered all of its contractual, compensatory damages in the total jury verdict amount of $233,000, did the trial court err in concluding that the plaintiff was not a "substantially prevailing party"?

4. Where the parties agreed and stipulated that the CASPA Claims, including a claim for interest under CASPA, would be taken up by the trial court after a jury trial, did the trial court err in conflating CASPA interest with contract interest, and relying on the absence of a jury verdict for contractual interest as a basis to determine that plaintiff was not a "substantially prevailing party"?

5. Where the trial court granted a motion for nonsuit on plaintiffs unjust enrichment claim and the jury was not charged regarding such claim, did the trial court err in denying plaintiffs CASPA Claims by concluding that the jury's award was "in the nature of a verdict for unjust enrichment" [(quoting Trial Ct. Op., 12/2/16, at 6)]?

6. Did the trial court err in failing to award statutorily mandated CASPA interest, penalties and attorneys' fees to plaintiff?

United's Brief at 4.[10]

---

[10] Although United raises six issues, it presents three arguments in its appellate brief. *See* Pa.R.A.P. 2119 ("The argument shall be divided into as many parts as there are questions to be argued").

All of United's issues relate to the trial court's denial of is claims for post-trial relief under CASPA. The standard of review from an order resolving a post-trial motion follows:

> Our standards of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
> There are two bases upon which a judgment [notwithstanding the verdict] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Shiflett v. Lehigh Valley Health Network, Inc.*, ___ A.3d ___, ___, 2017 WL 5184429, *12 (Pa. Super. 2017) (citation omitted). We add that "the trial judge is mandated to develop a complete record and to file a comprehensive opinion detailing the specific reasons relied upon in reaching his decision." *Ellingsen v. Magsamen*, 486 A.2d 456, 458 (Pa. Super. 1984).

In addressing United's claims, we are faced with a fundamental problem regarding how this case was tried. United's claims do not fall within the normal contemplation of a motion for post-trial relief following a jury

trial. United never presented its CASPA claims to the jury in this case, and it therefore is not seeking relief from an adverse jury verdict.

Based on the trial court's decision to put off a ruling on the defendants' motion to dismiss the CASPA claims until after the jury trial, United takes the position that it did not have to present its CASPA claims before the jury, as all parties stipulated to defer them until post-trial proceedings. Although we have difficulty interpreting the trial court's ruling on the motion to dismiss in that way, there now appears to be agreement among the parties and the trial court that there was a decision to defer litigation of the CASPA issues until after the jury trial, and we therefore accede to that common understanding of what occurred. But that means only that the parties agreed to waive their right to try the CASPA claims **before the jury**. Following that waiver, the CASPA claims still had to be tried **somewhere**, but we can find no indication that a trial of the CASPA claims ever occurred before any factfinder.

The parties apparently contemplated that there would be a trial of the CASPA claims before the court (after the jury rendered its verdict) — perhaps on the basis of evidence presented before the jury that would be supplemented by any additional evidence that the parties presented to the court after the jury was discharged. But the parties presented no evidence to the trial court after the jury was discharged; they presented arguments and briefs, but no evidence. And at no point did the trial court make any

factual findings or conclusions of law that would comprise a non-jury decision on the CASPA claims.

CASPA is an intricate statute. We explained its purpose in **Prieto Corp. v. Gambone Const. Co.**, 100 A.3d 602 (Pa. Super. 2014):

> CASPA is a comprehensive statute enacted in 1994 to cure abuses within the building industry involving payments due from owners to contractors, contractors to subcontractors, and subcontractors to other subcontractors. The underlying purpose of CASPA is to protect contractors and subcontractors and to encourage fair dealing among parties to a construction contract. The statute provides rules and deadlines to ensure prompt payments, to discourage unreasonable withholding of payments, and to address the matter of progress payments and retainages. Under circumstances prescribed in the statute, interest, penalty, attorney fees and litigation expenses may be imposed on an owner, contractor or subcontractor who fails to make payment to a contractor or subcontractor in compliance with the statute.

100 A.3d at 607 (citation and brackets omitted). Each of the various remedies afforded by the statute is subject to specified requirements of proof. Under Section 5, late payment may entitle a contractor to interest at a rate of 1% per month (an annual 12% interest rate), but only if the payment was made at least seven days after delivery of the invoice. 73 P.S. § 505; **see John B. Conomos, Inc. v. Sun Co., Inc. (R&M)**, 831 A.2d 696, 710 (Pa. Super. 2003), **appeal denied**, 845 A.2d 818 (Pa. 2004). Under Section 12(a), a claimant may recover an additional penalty of 1% per month (another 12% per year) if the payment was withheld wrongfully, but such recovery requires a determination that the owner did not withhold payment in good faith. 73 P.S. § 512(a); **see, e.g.**, **Waller Corp. v. Warren Plaza, Inc.**, 95 A.3d 313, 319 (Pa. Super. 2014); **Ruthrauff, Inc.**

*v. Ravin, Inc.*, 914 A.2d 880, 891 (Pa. Super. 2006), *appeal denied*, 962 A.2d 1197 (Pa. 2008). Under Section 12(b), the claimant may also recover attorneys' fees and expenses, but only if the claimant is a "substantially prevailing party in any proceeding to recover any payment under this act." 73 P.S. § 512(b); *see, e.g.*, *Imperial Excavating & Paving, LLC v. Rizzetto Const. Mgmt., Inc.*, 935 A.2d 557, 564 (Pa. Super. 2007); *Zavatchen v. RHF Holdings, Inc.*, 907 A.2d 607, 609 (Pa. Super. 2006), *appeal denied*, 917 A.2d 315 (Pa. 2007). These are factual issues that require proof. There are no findings establishing whether they were or were not proven here.

The trial court apparently tried to dispense with United's CASPA claims as a matter of law. With respect to the claim against Golden, it held that the claim failed because there was "slight evidence" of "any written contract" between Golden and United. Trial Ct. Op., 2/27/17, at 4. The meaning of this aspect of the trial court's decision is unclear. To the extent that the court held that there could be no recovery absent proof of a "written contract," the court erred. Section 2 of CASPA defines a "construction contract" under which there may be recovery as "[a]n agreement, whether written **or oral**, to perform work on any real property located within this Commonwealth." 73 P.S. § 502 (emphasis added). A written contract therefore is unnecessary. The court's reference to "slight evidence" also is problematic. Existence of a contract need only be proven by a preponderance of the evidence, and the trial court's reference to "slight

evidence" does not establish that a contract was not proven. We note that the jury found that Golden breached a contract with United — an aspect of the verdict that the trial court declined to overturn. Though the court described that aspect of the verdict as a finding of unjust enrichment, *see* Trial Ct. Op. at 6, United's claim of unjust enrichment had been taken from the jury by a nonsuit during trial, making the trial court's description incorrect. As we hold in the next segment of this memorandum, the jury's finding of a contract breach by Golden is supported by the evidence.[11]

With respect to United's CASPA claim against GKK, the trial court held that United could not recover unless it was a "substantially prevailing party" and said that United's relatively small recovery in relation to the $1.2 million United initially claimed meant that United did not have that status. Trial Ct. Op., 2/27/17, at 6-7. But although a claimant must be a "substantially prevailing party" to recover attorneys' fees and expenses under Section 12(b) of CASPA, 73 P.S. § 512(b), that status is not a prerequisite to recovery of interest or penalties under the statute's other sections. In addition, we have explained that "prevailing party" status is not entirely

---

[11] Golden argues that there was no contract on which United could recover under CASPA because the statute covers only construction contracts and United performed its work as a remediation consultant, not a construction contractor. Golden also argues that Golden was not an "owner" subject to the statute. Under CASPA, an "owner" is "[a] person who has an interest in the real property that is improved and who ordered the improvement to be made"; an "improvement" includes "[t]he erection, alteration, demolition, excavation, clearing, grading or filling of real property"; and a "construction contract" is an agreement "to perform work on any real property." 73 P.S. § 702. The trial court made no findings regarding Golden's status under these definitions.

dependent on the amount of damages awarded and is dependent on the trial court's exercise of discretion. *See J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 418 (Pa. Super. 2012); *Zavatchen v. RHF Holdings, Inc.*, 907 A.2d at 610-11. Here, whether United is a prevailing party may depend on whether it ultimately succeeds on its other CASPA claims.

Because the trial court erred in holding that United's CASPA claims are foreclosed as a matter of law, we reverse and remand the CASPA issues for further proceedings. On remand, the trial court must determine whether United proved any of its CASPA claims. Because the only evidence presented by United was that presented to the jury, the court must determine whether the terms of the parties' "stipulation" to have the CASPA claims determined after the jury was discharged permits it to decide those claims on the basis of the record presented during the jury trial. If not, the court must determine whether the stipulation permits United to still present evidence or whether the record is closed.

Once the state of the record is resolved, the court must assess the evidence to determine whether United is entitled to recover on its claims for interest, penalties, and attorneys' fees under the statute. Assessment of United's claim for interest requires the trial court to determine the scope of United's contracts with Golden and GKK in light of the jury's verdict awarding only limited damages against each defendant for breach of contract; whether payments were made late under Section 5 of CASPA depends on findings resolving which invoices each defendant was

contractually obligated to pay, when it was obligated to pay them, and in what amount. Assessment of the claim to penalties under Section 12(a) requires consideration of each defendant's good faith, to the extent that issue has been preserved by the parties. To address these issues, the trial court may direct that the parties file proposed findings of fact and conclusions of law. The court should make findings supporting its decision. **See Ellingsen**, 486 A.2d at 458.[12]

### No. 55 WDA 2017
### (GOLDEN'S CROSS-APPEAL)

The verdict sheet asked the jury to decide whether the Golden defendants, Golden Oil and Kehm Oil, each breached a contract with United. The jury answered "Yes" to both questions and awarded $37,500 in damages from each of them, for a total of $75,000.

The Golden defendants raise the following issues:

1. As a matter of fact, is there any evidence to support the jury's finding that [United] entered into a contract with Golden Oil Company and/or Kehm Oil Company?

2. As a matter of law, can Golden Oil Company and Kehm Oil Company be liable under a contract based purely on solicitous statements and actions that were meant to be helpful and do not themselves constitute a contract when there is already a written contract between other parties covering the transaction?

Golden's Brief, 55 WDA 2017, 6/16/17, at 5.

---

[12] In light of our disposition, we need not consider the other issues raised by United. **See Eckell v. Wilson**, 597 A.2d 696, 697 (Pa. Super. 1991), **appeal denied**, 607 A.2d 253 (Pa. 1992).

We review an order denying a post-trial motion for judgment notwithstanding the verdict for an abuse of discretion or error of law. *Shiflett*, ___ A.3d at ___, 2017 WL 5184429 at *12. We add that "[q]uestions of credibility and conflicts in the evidence are for the [fact-finder] to resolve and the reviewing court should not reweigh the evidence. If there is any basis upon which the jury could have properly made its award, the denial of the motion for judgment n.o.v. must be affirmed." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 891 (Pa. Super. 2011) (*per curiam*) (citation omitted), *aff'd*, 106 A.3d 656 (Pa. 2014), *cert. denied*, 136 S. Ct. 1512 (2016).

Though framed as two issues, Golden really presents one argument: that there was no evidence of a contract between United and Golden. Golden notes that, although United provided Golden with a price quote for remediation before Golden sold the gas station property to GKK, Golden never accepted or signed any quote. Rather, after GKK bought the property, GKK — not Golden — signed the remediation contract with United. Golden adds that United was not a signatory to its contract to sell the property to GKK and there was no testimony or evidence that United was a third-party beneficiary of that sale agreement.

United contends that the jury found that there was an oral contract based on Kehm's statements that it was Golden's responsibility to pay for remediation and on the $100,000 payment to United that Kehm authorized under protest. United argues that the prior course of dealing between it and

- 30 -

Golden shows that it conducted remediation projects at Golden's request on a "handshake basis." United's Brief, 7/17/17, at 24. United referenced testimony that Kehm, Golden's president, orally directed Klesic, United's president, to clean up the property and keep GKK happy. *Id.* at 25 (quoting N.T., 5/12-13/15, at 5, 71).

Golden responds that none of Kehm's statements establish an oral contract. Golden argues that "it is legally impossible to have an oral agreement that covers the same work as a written agreement," Golden's Brief at 23, and cites *Walker v. Saricks*, 63 A.2d 9 (Pa. 1949), for the proposition that "[a]ll preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . [which] constitutes the agreement between the parties, [whose] terms cannot be added to nor subtracted from by parol evidence." United, according to Golden, has not established that Pennsylvania law permits it to have a written contract with GKK and an oral contract with Golden for the same work.

Generally —

An agreement is an enforceable contract wherein the parties intended to conclude a binding agreement and the essential terms of that agreement are certain enough to provide the basis for providing an appropriate remedy. If the essential terms of the agreement are so uncertain that there is no basis for determining whether the agreement has been kept or broken, there is not an enforceable contract.

*Linnet v. Hitchcock*, 471 A.2d 537, 540 (Pa. Super. 1984) (citations omitted). "Parties may, by subsequent oral agreement, modify a written

contract which they previously have entered into. The new contract thus agreed upon is a substitute for the original one in so far as it alters, modifies, or changes it." ***Wagner v. Graziano Const. Co.***, 136 A.2d 82, 84 (Pa. 1957) (citation omitted); ***accord Consol. Tile & Slate Co. v. Fox***, 189 A.2d 228, 230 (Pa. 1963) (modification of a contract "may be established by parol evidence showing either an express agreement or actions necessarily involving the alterations" (citation omitted)).

"It is well settled that in the case of a disputed oral contract, what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact for the jury." ***Solomon v. Luria***, 246 A.2d 435, 438 (Pa. Super. 1968). In ***Prieto***, we addressed whether the record established an oral contract between the parties and explained:

> [T]he question of whether an undisputed set of facts establishes a contract is a matter of law. It is also well settled that in order for an enforceable agreement to exist, there must be a "meeting of the minds," whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance. It is equally well established that an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer is accepted. In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent. We must, therefore, look to the parties' course of conduct to ascertain the presence of a contract.

***Prieto***, 100 A.3d at 609 (citation omitted).

The plaintiff in ***Prieto*** was a general contractor, and the defendant was a subcontractor specializing in the construction of curbs. ***Prieto***, 100 A.3d at 605. The parties had worked together for eight years on 198 jobs.

*Id.* The parties' usual custom was that the contractor would ask the subcontractor for a bid, the subcontractor would fax a proposal to the contractor, the contractor would respond with a purchase order, and the subcontractor would begin work. *Id.* Citing this course of conduct, the subcontractor successfully sued for breach of four oral contracts, and the contractor appealed to this Court with a challenge to the sufficiency of the evidence for those oral contracts. *Id.* at 605, 608-09. We held that the contractor's argument that the evidence of an oral contract was deficient was "belied by Appellant's partial payment of some of the instant invoices, thus evidencing acceptance." *Id.* at 610.

Our opinion in *Prieto* discussed a similar factual pattern in *Boyle v. Steiman*, 631 A.2d 1025 (Pa. Super. 1993), *appeal denied*, 649 A.2d 666 (Pa. 1994). The plaintiffs in *Boyle* were the administrators of the estate of a private investigator. They sued a personal injury attorney for breaching an oral contract by failing to pay fees for investigating "various personal injury cases." Rejecting the defendant's challenge to the sufficiency of the evidence of an oral contract, we stated:

> Instantly, the evidence presented by the [plaintiffs] was more than sufficient to meet their burden of proving the existence of an oral contract between the [investigator] and the [defendant]. The administrators' testimony reveals that the [defendant] would contact the [investigator] or the administrators with personal injury cases and these cases would be investigated and results of the investigations would be submitted to the [defendant] together with a bill. The [defendant] then paid every bill submitted to him. This course of dealing continued until 1983 when the [defendant] began to fail to pay some of the bills submitted to him by the [investigator]. Thus, the evidence presented by the administrators was sufficient to meet their

burden of establishing the existence of an oral contract for investigative services between the parties. Additionally, the evidence established a course of dealings between the parties that proved that the [investigator] expected to be paid for his investigative services and was not accepting the investigation assignments on a contingency basis as alleged by the [defendant]. Finally, the [defendant's] own testimony establishes the existence of an oral contract between the parties for investigative services and that these services were provided by the [investigator] on all of the disputed bills.

*Boyle*, 631 A.2d at 1033-34.

Here, the evidence was sufficient to establish a contract between Golden and United. The parties had a longstanding business relationship based on informal contacts. Golden's president, George Kehm, acknowledged that Golden had responsibility for remediation of the gas station site, N.T., 5/12/15, at 144, and Golden paid United for some of its remediation services. The jury could find that this evidence established a contractual relationship.

It is true that United also contracted with GKK for remediation services. But that contract stated that, although it was anticipated that the Tank Fund would reimburse United, the site's owner was responsible for expenses not reimbursed by the Tank Fund. Ex. A to Fourth Am. Compl., 2/29/12. The contract did not specify whether the payor would be United or Golden. No one disputes that, although United's contract was with GKK, United invoiced both GKK and Golden, and each company paid some of those invoices. Golden's payments were consistent with a thirty-year history between Golden and United, including "a lot of work" in which the parties dealt "on handshakes." N.T., 5/12/15, at 147; *cf. Prieto*, 100 A.3d at 609-

- 34 -

10. Kehm testified that the Tank Fund had reimbursed fifty other remediation projects, and so he anticipated the Tank Fund would also pay in this one. *Id.* at 146. The jury heard the parties' testimony about their course of conduct and appeared to reconcile the two contracts by finding that Golden and GKK each was responsible for a portion of the outstanding debt to United, thus avoiding duplicate obligations. We cannot say that the jury erred in reaching this conclusion.

For all these reasons, we conclude that the record was not so clear as to require us to order entry of judgment notwithstanding the verdict in favor of Golden and adverse to United, and we affirm the trial court's decision not to do so.

## No. 82 WDA 2017
### (GKK's Cross-Appeal)

GKK contends that the trial court erred in declining to enter judgment notwithstanding the verdict on its cross-claim against Golden. Its appeal presents the following issues:

> Whether the trial court erred, as a matter of law, in denying [GKK's] post-trial motion for judgment NOV, as the agreement of sale was clear and unambig[u]ous[.]
>
> Whether the trial court erred as a matter of law, as the agreement of sale required Golden Oil to indemnify GKK for any and all work to bring the subject property into compliance with the applicable DEP UST regulations for site closure[.]
>
> Whether the trial court erred as a matter of law in denying GKK's post trial motion for a new trial[.]

GKK's Brief, 82 WDA 2017, 6/16/17, at 3.

The standard of review for an order denying a post-trial motion for judgment notwithstanding the verdict is to determine whether there was an abuse of discretion or error of law. **Shiflett**, ___ A.3d at ___, 2017 WL 5184429 at *12.

GKK's cross-claim sought indemnity from Golden if GKK were held liable to United:

> 66. Should [United] prevail on its claim for damages, as set forth in its Fourth Amended Complaint, which are alleged to have arisen from bringing the Property into compliance with the [Tank Fund's] regulations and other environmental regulations, Golden Oil Company is liable for any and all amounts alleged to have been due and owing.
>
> 67. GKK . . . ha[s] denied and continue to deny that it is liable to [United] upon any theory as set forth in its Fourth Amended Complaint. Should [United] be entitled to recover from [GKK], although it is denied that [United] is so entitled, then [GKK is] entitled to indemnification and/or contribution from Golden Oil Company for the total amounts claimed. . . .

GKK's Answer, New Matter and Cross-cl. to Fourth Am. Compl., 4/3/12, at ¶¶ 63-67.[13] The cross-claim turns on Paragraph 10 of Golden's agreement to sell the gas station property to GKK, which said that Golden "shall . . . be responsible for bringing the Property into compliance with the applicable Pennsylvania Department of Environmental Protection's Underground Tank Storage (UST) regulations for site closure." Ex. 1 to GKK's Answer, New Matter and Cross-cl. to Fourth Am. Compl., 4/3/12.

GKK's Kamin testified as to his interpretation of Paragraph 10:

_____

[13] The record does not reflect that Golden filed a reply in response to GKK's cross-claim, but no party has alleged that Golden's failure to reply is an admission that it should indemnify GKK.

> That paragraph is a paragraph which notes what expenses the seller will be responsible for and the paragraph states that the seller, that's Golden Oil Company, shall also be responsible for bringing the property into compliance with the applicable Pennsylvania Department of Environmental Protection Underground Tank Storage (UST) Regulations for site closure.

N.T., 5/12/15, at 89; *id.* at 90. In GKK's view, Paragraph 10 is unambiguous and obligated Golden to be responsible for cleaning up the property. GKK's Brief, 82 WDA 2017, at 17, 19.

Golden's Kehm similarly testified that he believed it was Golden's responsibility to pay for cleanup costs. N.T., 5/12/15, at 146-47. Nevertheless, Golden argues that Paragraph 10 "does not say anything about Golden Oil making payments to GKK or to [United]." Golden's Brief, 82 WDA 2017, 7/17/17, at 20. In Golden's view, the language "vaguely identifies a responsibility for bringing the property into compliance." *Id.* Golden asserts that "words of 'general import' such as unspecific terms providing for indemnification for 'all claims' or 'any and all liability' — including language calling for indemnity 'to the fullest extent permitted by law'" are insufficient to establish a claim for indemnification. *Id.* at 22 (citations omitted). Golden contends that an agreement for indemnification must express "such an intent beyond doubt." *Id.* Golden also argues that United was GKK's consultant, Golden entered no contract obligating it to pay United for unnecessary work, and GKK waived the claim against it by failing to learn that United was overcharging the Tank Fund. *Id.* at 21.

The trial court observed that "[t]he jury was presented with the question of whether [Golden] was liable to GKK as a result of the sales

agreement and the jury answered that it did not find [Golden] liable and awarded no damages to GKK as to that claim." Trial Ct. Op. at 7. The trial court reasoned:

> The indemnification sought by GKK is based upon that sales agreement. Having found generally that [Golden] was not liable to GKK under that agreement, the fact that the jury determined that [Golden] was not liable under the specific indemnification provision or had satisfied his obligations thereunder would seem necessarily to follow.
>
> The jury may rationally have concluded that [Golden]'s payment to [United] satisfied the obligations of [Golden] to GKK.

*Id.* at 7-8. As noted above, the jury awarded $158,000 to United for its breach of contract claim against GKK and a total of $75,000 against the two Golden companies, for an award totaling $233,000. The trial court concluded that because the verdict did not shock its sense of justice, judgment notwithstanding the verdict was unwarranted. *Id.* at 8. We agree.

GKK is correct that the plain language of Paragraph 10 made Golden responsible for remediation costs. Following the heading "Seller's Expenses," the paragraph states that Golden "shall . . . be responsible" for expenses associated with complying with DEP regulations for tank removal. Golden's president, as well as one of GKK's managers, testified that this phrase meant that Golden was responsible for paying for the cleanup costs. N.T., 5/12/15, at 89-90, 146-47.

But the jury heard testimony that it was GKK that retained United to do the remediation work and that once remediation costs climbed above

United's original estimate, both GKK and Golden approved payment of United's invoices. Just as the evidence permitted the jury to conclude that Golden's course of conduct gave rise to contractual obligations to United, so too could the jury have concluded that the conduct of GKK and Golden after they signed the sale contract altered their agreement for payment of United's work. In addition, the jury heard testimony from the defendants that some of the invoices that were approved may have not been for work that was essential to the remediation project and so was outside the scope of the work covered by Paragraph 10.

In the end, it is evident that the jury rendered a compromise verdict that held GKK and Golden equally responsible for United's bills. It heard testimony that GKK had paid United $17,390.55 and Golden had paid $100,000 before trial, and it found that the amount that remained owing to United totaled $233,000; the jury thus priced the total cost of United's performance under the contract at approximately $350,000. The jury held GKK liable for $158,000 of the $233,000 balance due, which would make GKK's total payment to United $175,390.55 ($17.390.55 + $150,000). It held Golden liable for $75,000, which would make Golden's total payment $175,000 ($100,000 + $75,000). The jury may have concluded that its verdict against Golden for $75,000 satisfied the remainder of Golden's obligation under Paragraph 10 and that by ordering Golden to pay that amount directly to United, there was no need to have Golden make a payment to GKK.

Compromise verdicts are favored in the law. As we stated in ***Ely v. Susquehanna Aquacultures, Inc.***, 130 A.3d 6 (Pa. Super. 2015), ***appeal denied***, 136 A.3d 982 (Pa. 2016):

> Compromise verdicts are verdicts where the fact-finder is in doubt as to the defendant's liability vis-à-vis the plaintiff's actions in a given suit but, nevertheless, returns a verdict for the plaintiff in a lesser amount than it would have if it was free from doubt. Compromise verdicts are favored in the law. Although more commonplace in negligence cases tried before juries, such verdicts are equally appropriate in contract cases tried before the bench.

130 A.3d at 10-11 (quoting ***Morin v. Brassington***, 871 A.2d 844, 852-53 (Pa. Super. 2005)). Here, the jury's verdict resulted in GKK receiving less payment from Golden toward the total cost of United's work than the amount to which GKK claims it is entitled. We perceive no basis to disturb the jury's compromise verdict. ***See id.*** We therefore hold that GKK is not entitled to relief on this issue.

In sum, at Docket Nos. 1956 WDA 2017 and 294 WDA 2017, we reverse the order denying United's motion for post-trial relief, vacate the court's decision adverse to United, and remand for further proceedings consistent with this memorandum. At Docket No. 55 WDA 2017, we affirm the denial of Golden's motion for judgment notwithstanding the verdict. At Docket No. 82 WDA 2017, we affirm the order denying GKK's motion for judgment notwithstanding the verdict.

Orders resolving post-trial relief affirmed in part and reversed in part. Trial court's decision on United's CASPA claim vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/15/2017